United States District Court
Southern District of Texas
**ENTERED**
July 27, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LLOYD'S SYNDICATE 457, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-16-03050 |
| | § | |
| | § | |
| FLOATEC LLC D/B/A FLOATEC | § | |
| SOLUTIONS, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

A number of Lloyd's syndicates and maritime insurance companies, referred to in this opinion as "the Underwriters," sued Floatec LLC and American Global Maritime Inc., asserting that they were responsible for the expensive failure of a major offshore oil-and-gas construction project. (Docket Entry No. 32). Both Floatec and American Global Maritime moved to dismiss or compel arbitration. (Docket Entries No. 29, 30). The court held a hearing for argument on the motions. At the hearing, the court requested supplemental briefs. (Docket Entries No. 60, 61). Based on the motions, responses, replies, and the supplemental briefs, counsels' arguments, and the applicable law, Floatec's motion to dismiss, (Docket Entry No. 30), is granted, with prejudice and without leave to amend. American Global Maritime's motion to dismiss or compel arbitration, (Docket Entry No. 29), is denied. The reasons are stated in detail below.

## I.      Background

Several Lloyd's syndicates and a number of maritime insurers underwrote an Offshore Construction Risk Policy for Chevron USA, Inc., Statoil Gulf of Mexico LLC, and Marubeni Oil & Gas USA. The Policy covered construction operations for Chevron's "Big Foot" deepwater

1

drilling project in the Gulf of Mexico off the Louisiana coast.  (Docket Entry No. 41 at 12-13).  The project was to install an extended tension-leg platform drilling rig at a site about 225 miles south of New Orleans, in 5,200 feet of water.  The rig installation involved driving pilings into the seafloor, connecting "tendons" to the pilings, and ultimately connecting the tendons to the drilling platform. (Docket Entry No. 32 at ¶ 13-15).  During the attempted installation in late May and early June 2015, several tendons fell to the seafloor.  (*Id.* ¶¶ 20-21).  The Underwriters assert that they paid over $500 million to Chevron under the Policy.  (*Id.* ¶ 30).

Floatec and American Global Maritime contracted with Chevron to do work on the Big Foot project.  Floatec provided "engineering design and analysis" for the tendons and was "responsible for interface management for the entire project."  (*Id.* ¶ 18).  The Policy required Chevron to appoint a Marine Warranty Surveyor, and Chevron selected American Global Maritime.  (*Id.* ¶ 24).  The Marine Warranty Surveyor's duties included reviewing and approving engineering, design, and operational aspects of the construction project.  (*Id.* ¶¶ 24-25).  The Underwriters allege that Floatec and American Global Maritime's work was deficient and caused the tendons to fail during the rig installation.

The Underwriters allege that Floatec owed Chevron a duty of care, that the engineering work Floatec performed was negligent and grossly negligent in breach of that duty, and that the negligence proximately caused the tendon collapse.  (*Id.* ¶¶ 32-34, 36-38).

As to American Global Maritime, the Underwriters allege that it owed them a duty of care that it violated by failing to competently perform its Marine Warranty Surveyor duties.[1]  (*Id.* ¶¶ 42-

---

[1]  The Underwriters make various single-business-entity or alter-ego allegations against American Global Maritime.  These allegations not relevant to the present motions to dismiss.  They appear to be designed to justify adding several overseas Global Maritime entities as defendants.  Those entities are not relevant to this motion to dismiss.

44).  The Underwriters also allege that American Global Maritime negligently misrepresented the quality of its work as a Marine Warranty Surveyor and failed to adequately review the engineering and design of the project.  (*Id.* ¶¶ 46-49).  The Underwriters allege that American Global Maritime owed them a fiduciary duty, which it breached by improperly performing its work.   The Underwriters allege that these breaches caused the tendon failure and subsequent losses.  (*Id.* ¶¶ 51-53).  Finally, the Underwriters allege that both defendants are liable under Louisiana product-liability and redhibition law.  (*Id.* ¶¶ 54-59; 61-64).

Floatec and American Global Maritime filed motions to dismiss or, in the alternative, to compel arbitration.  The motions present several interlocking issues, discussed in detail below.  Both defendants argue that they are "Other Assureds" under the Chevron Policy, and therefore that the Policy's subrogation waiver and the antisubrogation rule bar the Underwriters' suit.   In the alternative, Floatec and American Global Maritime argue that their contracts with Chevron have broad arbitration clauses under which the Underwriters must arbitrate rather than litigate their claims.   The Underwriters respond that the court must address arbitrability first, and that the defendants are not Other Assureds.

## II.    Analysis

### A.    Choice of Law

This case arises from an effort to install a drilling rig on the seabed adjacent to Louisiana, bringing it within the choice-of-law provision in the Outer Continental Shelf Lands Act.  In cases arising on the seabed of the outer continental shelf or "artificial islands and fixed structures erected thereon," federal courts apply the substantive law of the adjacent state.  *Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 215 (5th Cir.), *order clarified on reh'g*, 829 F.3d 770 (5th Cir. 2016), *and cert. denied sub nom. Vicinay Cadenas, S.A. v. Petobras Am., Inc.*, 137 S. Ct. 1066, 197

L. Ed. 2d 177 (2017).  "Because OSCLA's choice of law scheme is prescribed by Congress, parties may not voluntarily contract around Congress's mandate."  *Id.*  Louisiana substantive law applies regardless of the choice-of-law provisions in the relevant contracts.

    **B.**    **The Order of Decisions**

Both sides argue that, depending on how the court rules on certain issues, arbitration is proper.  However, they disagree about the order in which the court should address the issues.  Floatec and American Global Maritime argue that, if the court finds that the Underwriters can sue them as Chevron's subrogee because they are not Other Assureds, then the litigation should be dismissed in favor of arbitration under the arbitration agreements in each defendant's contract with Chevron.  The defendants urge that that decision is logically made only after deciding whether one or both of the defendants are Other Assureds under the Chevron Policy.

The Underwriters make different arguments as to each defendant.  The Underwriters argue that their claims against American Global Maritime are not based on subrogation to Chevron's contractual rights, but rather on independent tort duties that American Global Maritime owed the Underwriters.  The Underwriters also argue that American Global Maritime waived its right to arbitrate by seeking a merits determination on its Other Assured status.  As to Floatec, the Underwriters also argue that Floatec waived its right to arbitrate.  However, they argue that if Floatec did not waive that right, their claims against Floatec are properly arbitrated because they are subrogated claims under Chevron's contract with Floatec.  That contract has a broad arbitration clause.  Both Floatec and American Global Maritime respond that all of the Underwriters' claims are brought as Chevron's subrogee, under the defendants' contracts with Chevron.  According to the defendants, the court should reach arbitrability only if it first finds that either Floatec or American Global Maritime, or both, are not Other Assureds under the Chevron Policy.

The defendants' proposed order of decisions is correct. The arbitration issue arises only if the court determines that the Underwriters can bring a subrogated action asserting Chevron's rights against the defendants. The arbitration clauses the defendants rely on are in their respective contracts with Chevron, not in the Policy. If the Underwriters cannot assert subrogated contract claims based on Chevron's rights, the arbitration agreements are irrelevant.

**C.    "Other Assured" Status**

The Chevron Policy contains a subrogation waiver that, in relevant part, provides that the Underwriters cannot bring subrogated claims against an "Other Assured." (Docket Entry No. 29-3 at 57). If the defendants are Other Assureds, the Underwriters concede that their claims against Floatec are barred, but they urge that their claims against American Global Maritime are not based on subrogation rights and can proceed. The first question is whether either or both of the defendants are Other Assureds. They are.

The Policy contains two provisions that bear on the defendants' Other Assured status. The first is the definition of who is an "Assured." The Policy defines "Principal Assureds" as:

> i. Chevron U.S.A., Inc., Statoil Gulf of Mexico LLC, [and] Marubeni Oil & Gas (USA) Inc.

> ii. Parent and/or subsidiary and/or affiliated and/or associated and/or inter-related companies of the above as they are now or may hereafter be constituted and their directors, officers and employees, while acting in their capacities as such;

The Policy defines "Other Assureds" as:

> iii. Project managers

> iv. Any other company, firm, person or party, including their contractors and/or sub-contractors and/or manufacturers and/or suppliers, with whom the Assured(s) named in i, ii and iii have entered into written contract(s) in connection

5

with the Project.

The other relevant Policy provision is the "Special Conditions for Other Assureds," which states:

> The interest of the Other Assured(s) shall be covered throughout the entire Policy Period for their direct participation in the venture, unless specific contract(s) contain provisions to the contrary. The rights of any Assured under this insurance shall only be exercised through the Principal Assureds. Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms, conditions and exclusions in the Policy.

(Docket Entry No. 29-3 at 56-57).

Both defendants entered into written contracts with Chevron "in connection with the project." The defendants are Other Assureds under the Policy definition. Floatec also argues that it is an Other Assured by virtue of its status as a project manager. According to the complaint, Floatec's duties included "interface management for the entire project, which required Floatec to ensure the complete integration of engineering analysis, design and data regarding all components by the various entities involved." (Docket Entry No. 32 at 8-9).

The Underwriters argue that merely having a written contract (or being a project manager) is not enough to be an Other Assured. They urge that Other Assured status requires the written contract between Chevron and the contractor to state explicitly that the contractor would be insured under the Policy. The "determinative issue," they urge, is the contract between Chevron and its contractor, and Chevron's contracts with American Global Maritime and Floatec do not explicitly pass the benefit of coverage under the Chevron Policy. The Underwriters also argue that the defendants' proposed interpretation of the Other Assured definition in the Policy conflicts with the "Special Conditions for Other Assureds" language. The Underwriters also argue that American

6

Global Maritime did not perform services within the scope of the Policy and therefore has no insurable interest.

The Underwriters cite six cases for the proposition that coverage under maritime all-risks policies like the one they issued to Chevron is determined by whether the contract between the Principal Assured and a contractor who is an alleged Other Assured requires the Principal Assured to add the contractor as an Other Assured on the Policy.

As the defendants accurately point out in their reply briefs, the problem for the Underwriters is that the relevant insurance policies in the cases that they cite limited the definitions of Other Assureds to those to whom the Principal Assureds had a contractual obligation to provide insurance. In other words, each cited case involved a materially different definition of an "Other Assured" that called for precisely the inquiry that the Underwriters urge here. The courts in those cases examined the Principal Assured's contracts with the party claiming it was an Other Assured because that was what the policy required. None of the cases supports a general proposition that, always and everywhere, Other Assured status is determined by reference to the contract between a Principal Assured and a putative Other Assured. Each cited case is distinguishable because the language of the relevant policy is different.

The Underwriters' first cited case is *WH Holdings, LLC v. Ace American Ins. Co.*, 481 F. App'x 894, 895 (5th Cir. 2012). The policy at issue in that case extended coverage to "any party in interest which the insured is responsible to insure"—expressly making coverage turn on the named insured's contract with the party claiming to be an Other Assured. *Id.* No such language is present in the Policy here. Next, the plaintiffs cite *Edwards v. Brambles Equip. Servs., Inc.*, 75 F. App'x 929, 932 (5th Cir. 2003). In that case, the policy's Other Assured section extended coverage

7

to "any person or organization you are required by written contract to include as an insured."  Again, the policy language is different here.

The Underwriters then cite *In re Deepwater Horizon*, 470 S.W.3d 452, 457 (Tex. 2015), *reh'g withdrawn* (May 29, 2015).  In that case, the policy extended Other Assured coverage to "[a]ny person or entity to whom the 'Insured' is obliged by oral or written 'Insured Contract' . . . to provide insurance such as afforded by [the] Policy."  So too in *Suire v. Lafayette City-Par. Consol. Gov't*, 2004-1459 (La. 4/12/05), 907 So. 2d 37, 52, in which coverage extended to "[a] person or organization [Boh Brothers] [is] required in a written contract to name as an insured[,]" and in *Jeld-Wen, Inc. v. Laidig Sys., Inc.*, No. CIV.A. 13-03172, 2015 WL 4681224, at *6 (W.D. La. Aug. 5, 2015), in which coverage extended to a person or organization that the named insured was "required to add as an additional insured" by reason of either "[a] written contract or agreement" or "[a]n oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued . . . ."  This case is different.

The plaintiffs also cite the Texas Supreme Court case of *Urrutia v. Decker*, 992 S.W.2d 440, 443 (Tex. 1999), for the proposition that "[t]ying additional-insured coverage to the terms of an underlying agreement allows the insured to determine in the agreements themselves which customers will be insured and the amount of their coverage."  But the policy in *Urrutia*, like those in the other cases just reviewed, made Other Assured coverage turn on the content of the named insured's contract with the party claiming to be an Other Assured.  *Id.* at 441.  The case is primarily important for the proposition that this kind of arrangement is permissible, and that under this arrangement the named insured can limit the scope of coverage passed on to the other party to the contract.  *In re Deepwater Horizon*, 470 S.W.3d at 460-61 (discussing *Urrutia*).  That is not the issue here.

As the defendants persuasively demonstrate, the Underwriters' cited cases do not support the claim that Floatec and American Global Maritime are not Other Assureds because their contracts with Chevron did not require them to be named as Other Assureds covered under the Chevron Policy.  The defendants are Other Assureds within the Policy Definition.

The Underwriters have an additional argument, based on the "Special Conditions for Other Assureds" Policy provision.  The Underwriters argue that the defendants' proposed construction of the Other Assureds provision would conflict with or render meaningless parts of the Special Conditions provision.  As noted above, that provision reads:

> The interest of the Other Assured(s) shall be covered throughout the entire Policy Period for their direct participation in the venture, unless specific contract(s) contain provisions to the contrary. The rights of any Assured under this insurance shall only be exercised through the Principal Assureds. Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms, conditions and exclusions in the Policy.

The Underwriters argue that this provision's wording is "consistent with the case law.  It provides Other Assureds access to coverage only if the Principal Assured chooses to *pass the benefits* of the insurance by written contract, and only if the contract contains no provisions 'to the contrary.'  Any coverage extended to Other Assureds 'shall be no greater than such contract allows.'"[2]  According to the Underwriters, the defendants' interpretation of the Other Assured definition makes the Special Conditions for Other Assureds portion of the Policy meaningless.  The Underwriters do not provide a persuasive argument or explanation of how or why the defendants' interpretation of the Other Assured definition conflicts with the Special Conditions clause.

---

[2]  The "case law" that the Underwriters argue supports their approach to this provision is not relevant, because the cases the Underwriters cited involved materially different policy language.

9

Floatec and American Global Maritime, by contrast, provide persuasive and detailed arguments for why there is no conflict between the Other Assured definition and the "Special Conditions" provision.  The first sentence of the provision states that Other Assureds are covered throughout the Policy period unless specific contracts—here, Floatec and American Global Maritime's contracts with Chevron—contain specific provisions to the contrary.  According to the defendants, there are no specific contrary provisions in play in this case.[3]  There is no conflict between the Other Assured definition and the first sentence of the Special Conditions for Other Assureds provision.

The next sentence limits the Other Assureds' ability to exercise their Policy rights by channeling them through Chevron and the other Principal Assureds.  There is no conflict between this sentence and the Other Assured definition.  To the contrary, this sentence simply limits an Other Assured's power to require the Underwriters to make insurance payments under the Policy.  This sentence does not affect Floatec and American Global Maritime's status as Other Assureds.

The third and final sentence of the Special Conditions for Other Assureds policy provision is the hardest to parse and comes the closest to a conflict with the Other Assured definition, but it too is reconcilable.  The third sentence reads: "Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms, conditions and exclusions in the Policy."  The Underwriters seem to argue that this sentence shows that a person or entity becomes an Other Assured by contracting for Other Assured status—meaning that Chevron's contracts with Floatec and American Global Maritime would have to specifically

---

[3]  The Underwriters contest this characterization.  Their arguments are addressed below.

state that Chevron was passing the Policy benefits to them.  But that is not the only, or best, way to read the sentence.  Given the Policy definition of an Other Assured that plainly does not require the contract between the Principal Assured and the Other Assured to address the subject of insurance, the reasonable construction of this sentence is one that harmonizes, rather than conflicts, with other Policy provisions.

The reasonable, harmonizing construction reads this sentence as a permissive grant of power to the Principal Assureds to restrict the scope of an Other Assured's coverage, if they wish to do so, by placing a restriction in their contracts with the Other Assured.  The sentence does not require that the contract between the Principal Assured and the putative Other Assured specifically provide that the Other Assured receive coverage.  Its language—"*Where* the benefits of this insurance have been passed to an Assured by contract"—contemplates cases in which a party is entitled to Policy benefits in the absence of a specific contract provision passing those benefits to that party.[4]  The Underwriters' policy interpretation is that no party can become an Other Assured without specific language in that party's contract with the named assured requiring that that party receive coverage under the Policy.   But under this interpretation, there is no situation in which the benefits of the contract are not "passed to an Assured by contract," rendering the first, conditional portion of the sentence—"*Where* the benefits of this insurance . . ."—meaningless.  If the Underwriters had argued that, for example, "Project Managers" but not ordinary contractors received Other Assured coverage automatically, they might have an argument here.  In that case, there would be a category of Other Assureds—Project Managers—who would receive coverage automatically rather than only when

---

[4]  The "where" language is important.  In their surreply, the Underwriters argue that this language "requires the benefits of insurance be 'passed to an Assured by contract . . . .'"  That conspicuously omits the conditional phrasing of the sentence, which dramatically alters the apparently meaning of the provision.  This sentence comes into effect if and only if the named assured's contract with the putative Other Assured addresses the subject of coverage under the Policy.

their contract with a Principal Assured conveyed coverage.  But the Underwriters instead adopt an interpretation under which every Other Assured gains that status by contract.

The combined effect of the "Other Assured" Policy definition and the first sentence of the "Special Conditions" Policy provision is to confer Other Assured status on a party if that party has a contract with Chevron that is related to the project and the contract is silent on the question of builder's risk insurance.  The third sentence means that, when the Chevron contract *does* specifically address the contractor's right to coverage under the Chevron Policy, the parties cannot contract to expand the scope of coverage, but they can contract to reduce the scope of coverage.  In other words, the clause permits, but does not require, Chevron to specifically address the scope of coverage in its contractor agreements.   There is no conflict between the defendants' (correct) interpretation of the Other Assured definition and the Special Conditions for Other Assureds provision.

The Underwriters advance a fallback argument in their supplemental brief.  The first sentence of the "Special Conditions for Other Assureds" provision states that Other Assureds are covered unless "unless specific contract(s) contain provisions to the contrary."  The Underwriters point to two provisions in the defendants' contracts with Chevron that, the Underwriters say, are "to the contrary" and show that the defendants are not entitled to coverage under the Policy.  The first is a provision stating that each defendant's "insurance . . . is primary . . . and that no other insurance carried by [Chevron] will be considered as contributory insurance for any loss."  (Docket Entry No. 30-3 at 28-29 (Floatec contract); Docket Entry No. 29-4 at 33-34 (American Global Maritime contract)).  The second is a provision stating that each defendant is obliged to indemnify Chevron for damage to Chevron's property arising from the performance of the contract.  (Docket Entry No. 30-3 at 41-42 (Floatec contract); Docket Entry No. 33-4 at 28) (American Global Maritime contract)).  According to the Underwriters, these provisions show that "Chevron's contractual risk

allocation is wholly inconsistent" with the defendants' argument that "Chevron intended to insure them under the . . . policy." The Underwriters argue that two Texas intermediate appellate cases suggest that, under policy language similar to that at issue here, support their argument that "an Other Assured's coverage is limited to that provided by its contract with the Principal Assured." *See Offshore Recruiting Servs., Inc. v. New Hampshire Ins. Co.*, No. 01-10-00946-CV, 2011 WL 6938531 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011); *Wellington Underwriting Agencies Ltd. v. Houston Expl. Co.*, 267 S.W.3d 277 (Tex. App.—Houston [14th Dist.] 2008), *order withdrawn* (Apr. 9, 2010), *aff'd*, 352 S.W.3d 462 (Tex. 2011).

The Underwriters' arguments are unpersuasive for the reasons ably explained by the defendants in their own supplemental brief. First, the provisions in Chevron's contracts with Floatec and American Global Maritime that the Underwriters rely on are taken out of context. The Underwriters' central pull-quote from the Chevron contracts—the requirement that the defendants' "insurance . . . is primary . . . and that no other insurance carried by [Chevron] will be considered as contributory insurance for any loss"—refers to the specific types of insurance coverage that the contracts require Floatec and American Global Maritime to maintain, including commercial general liability insurance and automobile injury and property damage liability insurance. (Docket Entry No. 30-3 at 28-29 (Floatec contract); Docket Entry No. 29-4 at 33-34 (American Global Maritime contract)). Builder's risk insurance (like the Chevron Policy) is not on the list of policies that the defendants are required to maintain, and the . The Underwriters' quoted language provides no support for their argument. Similarly, the indemnity provisions do not support the Underwriters' position. These provisions have nothing to do with the defendants' Other Assured status or their right to coverage under the Chevron Policy.

13

Nor do the cases that the Underwriters cite advance their position.  To the contrary, *Offshore Recruiting* supports the defendants' position.  In that case, Petrodrill hired Offshore to staff a drilling project.  2011 WL 6938531 at *1.  The contract required Offshore to maintain a liability policy and to indemnify Petrodrill for losses arising from personal injuries or death occurring in the course of performance.  Petrodrill, in turn, had a policy issued by London insurers.  That policy had an Other Assured definition similar to the one here: it covered anyone who had entered into a written contract with Petrodrill in connection with the project.  *Id.* at *3.  It also had a Special Conditions for Other Assureds provision similar to the one in the Chevron Policy, including language identifying "provisions to the contrary" as a limit on coverage and stating that Other Assureds could exercise their right to coverage only through the Named Assured.  *Id.*  During the construction project, a worker was killed in an accident.  His estate sued Petrodrill, which settled the claim.  According to Offshore, the London insurers paid the settlement amount.  Petrodrill then sued Offshore, asserting that Offshore had to indemnify it under their contract.  *Id.* at *1.  Offshore invoked the arbitration clause in the contract, and the matter was arbitrated in London.  *Id.*  Late in the arbitration proceedings, Offshore sought to amend its answer to allege that the London insurers, not Petrodrill, were the real plaintiffs-in-interest, and to assert its Other Assured status and the subrogation waiver in the Petrodrill policy as an affirmative defense, an argument essentially identical to the defendants' arguments here.  The arbitrator held that Offshore had waived these arguments by failing to raise them timely and entered an award against Offshore.  *Id.*

Offshore then sued the London insurers, seeking coverage for the arbitration award and arguing that the insurers had breached the insurance policy by instituting the Petrodrill suit.  *Id.* at *2. The Texas appellate court affirmed the trial court's grant of summary judgment for the insurers. The court held that Offshore was not entitled to coverage for several reasons, including that: (1) the

wrongful-death award was covered by insurance that Offshore was required to purchase under its contract with Petrodrill; and (2) the London policy allowed Offshore to seek coverage only through Petrodrill. The court then turned to Offshore's claim that the London insurers had breached the subrogation-waiver provision of the policy by suing Offshore, despite its Other Assured status. The court ruled against Offshore, but its reasoning strongly supports the current defendants' arguments. The Texas court held that the antisubrogation provision was not a valid basis for an independent breach-of-contract action. However, the court assumed that Offshore was an Other Assured under the policy definition and that "Offshore could have raised the waiver-of-subrogation argument as an affirmative defense in the arbitration" if it had not waived its right to do so. *Id.* at *6. The Underwriters' citation to *Wellington* is inapposite; other assured status was not in dispute in that case and there is no meaningful holding or discussion helpful to this case.

In short, both Floatec and American Global Maritime are Other Assureds under the Policy, and nothing in their contracts with Chevron or the applicable law limits their right to assert the subrogation waiver as a defense. This court's opinion in *OPI Int'l, Inc. v. GAN Minster Ins. Co., Ltd.*, No. 4:94-cv-02756, Docket Entry No. 47 (Jan. 22, 1997), is consistent with the defendants' position that they are protected by the subrogation waiver in the Chevron Policy. The policy in question defined "Other Assureds" as, in relevant part, those who had entered into "contract(s) in connection with the subject matters of Insurance, as their interest may appear." *Id.* at 7. The subrogation waiver applied to "any named Assured and any person . . . whose interests are covered by this policy . . . ." *Id.* One contractor damaged a part of the project that another contractor was constructing. This court first found that the defendant contractor was an Other Assured because it had contracted with the named assured regarding the construction project that was the subject of the insurance policy. The contractor's contract with the named assured specified that the contractor

15

would receive coverage under the policy, but that did not determine Other Assured status.  What mattered was the existence of a contract about the subject-matter of the insurance.  *Id.* at 22.  This court rejected the insurer's argument that Other Assured status and entitlement to benefit from the subrogation waiver should be determined by reference to the contract between the named insured and the contractor defendant.  The opinion noted that the policy definition of an Other Assured did not depend on the insurance-related content of any external contract.  *Id.* at 32.  Nonetheless, the "as their interest may appear" language limited the insurance coverage.  That language, the opinion stated, meant that the contractor defendant was covered only for losses from damage to its own work, the part of the project that it contracted to build.  *Id.* at 23.  But the contractor was still entitled to the benefit of the policy's antisubrogation provision, which waived the insurer's right to proceed against any person whose "interests are covered by this policy . . . ."

The waiver provision did not state that Other Assureds were protected only to the extent of their coverage.  Rather, the policy flatly waived subrogation rights against anyone whose interests were covered at all.  *Id.* at 23, 32-33.  Relying on several Fifth Circuit cases, the court found that its ruling was consistent with general antisubrogation principles barring an insurer from asserting subrogated claims of one insured against a coinsured.  *Id.* at 23-28.  As a result, the plaintiff insurer could not recover against the defendant contractor as the insured's subrogee.

*OPI* strongly supports the defendants' argument that there is a meaningful and important distinction between an Other Assured's right and ability to receive coverage on the one hand, and its right to benefit from a subrogation waiver on the other.  *OPI* demonstrates that the Underwriters' arguments about the Special Conditions provisions are misplaced, because those limitations on coverage do not affect the subrogation waiver.

16

The Underwriters' final argument is that American Global Maritime's claim to be an Other Assured is barred because the Policy does not cover the type of work that American Global Maritime did. The Underwriters argue, based on declarations from participants in the maritime insurance business, that the Policy was intended to "cover the interest at risk in the procurement, fabrication, construction, and installation of the insured materials, parts, property and work that is 'destined to become a part of the completed project.'" (Response at 28). The Underwriters argue that a Marine Warranty Surveyor's duties do not include "procuring materials, fabricating parts, constructing or installing the platform." (*Id.*). Therefore, they say, surveyors are not insured under the Policy. The Underwriters cite this court's opinion in *Tucker Energy Servs., Inc. v. Noble Denton & Assocs., Inc.*, No. CIV.A. H-98-1126, 2003 WL 24108197, at *26 (S.D. Tex. Mar. 31, 2003), *aff'd*, 102 F. App'x 842 (5th Cir. 2004), for the proposition that a "professional marine surveyor's duties are not related to construction or manufacture . . . ."

The Chevron Policy, however, is not as limited as the Underwriters argue. It covers not only "procurement, fabrication, construction, and installation"—the only activities the Underwriters' brief discusses—but also "[p]roject studies, engineering, contingencies, design, [and] project management," in addition to a variety of other activities. (Docket Entry No. 30-2 at 24). The Underwriters themselves allege that American Global Maritime's role was to provide "technical engineering review and approval of design bases, engineering drawings, specifications, plans and procedures; and review and approval of operational aspects of the installation process . . . ." Those activities are clearly within the Policy's coverage. The citation to *Tucker* is not persuasive, as that case's statement about the scope of a marine surveyor's duty was heavily factbound. In that case, but not in this case, the surveyor had nothing to do with the manufacture of the product it surveyed. Not so here.

The defendants are Other Assureds within the meaning of the Chevron Policy. The Underwriters concede, given that ruling, that their claims against Floatec must be dismissed because they are subrogated claims. (Docket Entry No. 41 at 24 ("The claims against Floatec are admittedly grounded in subrogation and Underwriters do not dispute they stand in the shoes of Chevron.")).

### D.  Claims Against American Global Maritime

The claims against Floatec are dismissed with prejudice. American Global Maritime presents a different issue. The Underwriters' claims against American Global Maritime are pleaded as direct tort claims rather than as claims brought as a subrogee of Chevron. The Underwriters allege that American Global Maritime owed them a duty to do its surveying work in a competent and workmanlike manner, that it negligently failed to do so, and that, as a foreseeable result of that failure, the Underwriters were harmed when they had to make substantial payments under the Policy. The Underwriters argue that American Global Maritime's Other Assured status is irrelevant. Because their claims do not depend on subrogation, the subrogation waiver (and the antisubrogation rule generally) do not impact these claims.

The Underwriters appear to be correct about two core propositions. The first is that the antisubrogation rule applies only to subrogated claims. The second is that, under Louisiana law, the Underwriters have stated a plausible tort claim against American Global Maritime that does not depend on a subrogated assertion of Chevron's rights.

The Louisiana antisubrogation rule that American Global Maritime cites is that "an insurance company, which has paid a claim *and taken a subrogation*" cannot bring a subrogated suit—a suit asserting the rights of the insured whose claim it paid—against a coinsured. *See Louisiana Fire Insurance Co. v. Royal Indem. Co.*, 38 So. 2d 807, 810 (La. App. 2d Cir. 1949) (emphasis added); *see also Holden v. Connex-Metalna*, No. CIV.A.98-3326, 2000 WL 1818530, at *8 (E.D. La. Dec.

18

12, 2000).  American Global Maritime repeatedly states the rule as a bar against an insurer suing an insured for losses that it suffers when it pays on a policy.  But the cases that American Global Maritime cites, and those the court has found, state a narrower principle: that an insurer cannot, after making a payment, assert the rights of one insured in a subrogated action against a coinsured. American Global Maritime would extend the rule to bar any action by an insurer against a coinsured, rather than only barring subrogated claims.  The cases that American Global Maritime cites do not support that extension.  One of the cases it cites, *Holden*, in turn relies on Fifth Circuit authority that recognizes a distinction between a subrogated claim—prohibited under the antisubrogation rule—and a freestanding claim that exists "outside the policy . . . ." *Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1177 (5th Cir. 1992); *United States v. St. Bernard Par.*, 756 F.2d 1116, 1127 (5th Cir. 1985).  The claims in this suit are precisely that type of freestanding claim—they exist outside of the contract between Chevron and American Global Maritime.

The scope of the Louisiana antisubrogation rule is important, because the Underwriters have pleaded a direct, nonsubrogated Louisiana-law tort claim against American Global Maritime. Louisiana does not recognize an economic-loss rule in tort, instead evaluating cases involving purely economic harms under an ordinary duty-and-risk analysis.  *Cedarholley Inv., LLC v. Pitre*, 2016-0641 (La. App. 1 Cir. 12/22/16), 209 So. 3d 850, 853.  "Under the traditional duty-risk analysis, whether a duty is owed is a question of law."  *Maw Enterprises, L.L.C. v. City of Marksville*, 2014-0090 (La. 9/3/14), 149 So. 3d 210, 217.  "The inquiry is whether the plaintiff has any law—statutory, jurisprudential, or arising from general principles of fault—to support his claim."  *Id.* (quoting *Hardy v. Bowie*, 98–2821, p. 12 (La.9/8/99), 744 So.2d 606, 614).  "In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the

19

unique facts and circumstances presented." *Finch v. HRI Lodging, Inc.*, 49,497 (La. App. 2 Cir. 11/19/14), 152 So. 3d 1039, 1044.

The Underwriters argue that surveyors should follow well-defined best practices; that American Global Maritime did not do so; and that the failure violated duties it owed to the Underwriters. In support, the Underwriters cite Louisiana cases holding that, under Lousiana tort law, a surveyor or other similar construction-related professional-services provider owes a duty to parties it did not contract with but who foreseeably relied on the professional's work.[5]

American Global Maritime does not adequately respond to these arguments and authorities. Its briefing assumes that the claims against it are barred by the antisubrogation rule. But the Underwriters are not asserting Chevron's rights against American Global Maritime. The Underwriters could prevail under the Louisiana tort rules they cite without proving that American Global Maritime violated any duty it owed to Chevron, whether that duty arose in contract or tort. The Underwriters are asserting that, under Louisiana law, American Global Maritime owed a tort duty directly to the Underwriters and foreseeably harmed the Underwriters when it violated that duty. That is not a subrogation claim. American Global Maritime has not cited, and the court has not found, cases addressing analogous facts and arguments reaching the result American Global Maritime advocates.

American Global Maritime in effect argues that the court should evaluate the Underwriters' claims on a functional rather than a formal basis and conclude that the Underwriters' claims are in

---

[5] *E.g.*, *Colbert v. B.F. Carvin Const. Co.*, 600 So. 2d 719, 723 (La. App. 5 Cir. 1992), *writ denied sub nom. Colbert v. B.F. Carvin Const. Co.*, 604 So. 2d 1309 (La. 1992), *and writ denied*, 604 So. 2d 1311 (La. 1992) (citing and discussing *R & R Enter. v. Rivers & Gulf Marine Survey*, 476 So.2d 12 (La. App. 5 Cir.1985) and *Impressive Builders v. Ready Mix, Inc.*, 535 So.2d 1344 (La. App. 5 Cir.1988)).

effect subrogated claims.  That conclusion is intuitively attractive.  A Louisiana court might reject the Underwriters' direct tort claims against American Global Maritime as impermissible artful pleading, or find that, in this case, public policy strongly militated against concluding that American Global Maritime owed the Underwriters a tort duty.  Or a Louisiana court could find that this unusual set of facts justified an extension of the antisubrogation rule to bar any claim that, while not pleaded as a subrogated claim with the insurer standing in the shoes of its insured, would nonetheless have the functional effect of reimbursing an insurer for payments it made under the policy. But American Global Maritime has provided neither authority nor argument to support these approaches.  Instead, it has assumed that the claims against it are barred by the antisubrogation rule, without explanation or argument.

American Global Maritime is free to provide authority and argument in support of its positions at summary judgment.  But the current record and briefing does not provide the court with an adequate basis to dismiss American Global Maritime.  Therefore, American Global Maritime's motion to dismiss is denied.

American Global Maritime's alternative motion to compel arbitration is denied for a similar reason.  The Underwriters' claims against American Global Maritime are based on independent tort duties that American Global Maritime allegedly owed to the Underwriters.  American Global Maritime's arbitration argument was predicated on its assumption that the Underwriters were asserting Chevron's rights, thereby triggering the arbitration clause in the American Global Maritime contract with Chevron.  Because the Underwriters are not asserting Chevron's rights, that agreement does not apply.  American Global Maritime has not identified, and the court is not aware, of any arbitration agreement between American Global Maritime and the Underwriters.  On the present record, the motion to compel arbitration fails.

III.    **Conclusion**

For the reasons explained in this opinion, Floatec's motion to dismiss, (Docket Entry No. 30), is granted with prejudice.  American Global Maritime's motion to dismiss or compel arbitration, (Docket Entry No. 29), is denied.

SIGNED on July 27, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

22