**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LLOYD'S SYNDICATE 457, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-16-3050 |
| | § | |
| AMERICAN GLOBAL MARITIME | § | |
| INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Insurers who paid Chevron Corporation policy proceeds for damage to an oil drilling platform in the Gulf of Mexico have sued the platform's marine warranty surveyor, alleging breach of fiduciary duties, redhibition, products liability, and negligence under Louisiana law. The insurers are Lloyd's Syndicates; Arch Insurance Company (Europe) Limited; Axis Specialty Europe Limited; General Security Indemnity Company; Houston Casualty Company; Hyundai Marine and Fire Insurance Company; Infrassure Limited; International General Insurance Company Limited; International Insurance Company of Hannover Limited; Lancashire Insurance Company (UK) Limited; Mitsui Sumitomo Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Sompo Japan Insurance Incorporated; Statoil Forsikring A.S.; Tokio Marine and Nichido Fire Insurance Company Limited; and Zurich Insurance PLC UK (together, the "Underwriters"). The marine warranty surveyor sued is American Global Maritime Inc. The Underwriters also sued American Global Maritime's foreign parent, grandparent, and sister companies, Global Maritime AS, Global Maritime Consultancy Limited, and Global Maritime Holdings Limited. The foreign Global Maritime companies moved to dismiss for lack of personal jurisdiction, and American Global Maritime moved for summary judgment.

For the reasons set out below, the court grants the motion to dismiss for lack of personal jurisdiction and grants the motion for summary judgment in part. As a result, the claims against Global Maritime Group, Global Maritime Consultancy, and Global Maritime Holdings are dismissed, without prejudice, and the fiduciary duty, redhibition, and products liability claims against American Global Maritime are dismissed, with prejudice. The motion for summary judgment as to the negligence claims is denied, without prejudice to the parties moving for summary judgment on an expanded record after discovery.

## I.    Background

### a.    Facts

In 2014, Chevron contracted with a number of companies to build an oil drilling platform with tension legs approximately 225 miles south of New Orleans, Louisiana. Project "Big Foot" was designed to reach through 5,185 feet of water to oil reserves beneath the seabed. Sixteen steel tethers, or "tendons," would secure the platform to the seabed. While the tendons were being installed, they would be clamped to tendon buoyance modules to keep them afloat. Each clamp had 12 bolts.

Heerema Marine Contractors Nederland BV and Heerema Marine Contractors U.S. Inc. transported and installed the platform parts. (Docket Entry No. 1-1 at 13). McDermott Inc. procured and fabricated the tendons and buoyancy modules, and their components. (*Id.*). Detail Design Inc. designed the buoyancy modules and specified the bolts for the clamps. (*Id.*). FloaTEC LLC provided the "engineering design and analysis for the pre-service conditions to which the tendons, [buoyance modules] and associated parts would be subjected." (*Id.*).

Chevron obtained insurance for the Big Foot Project. The primary policy, issued by Aon

Limited, "insure[d] against all risks of physical loss" and "damage" for "works executed anywhere in the world in the performance of all contracts relating to the Project." (Docket Entry No. 98-1 at 61). The covered "works" included:

> Project studies, engineering, contingencies, design, project management, procurement, fabrication, construction, prefabrication, storage, load out, loading/unloading, transportation by land, sea or air . . . , towage, mating, installation, burying, hook-up, connection and/or tie-in operations, testing and commissioning, existence, initial operations and maintenance, testing, trials, pipelaying, trenching, and commissioning.

(*Id.* at 56). The Policy listed Chevron as one of the "Principle Assureds" and defined "Other Assureds" as "Project managers" or "[a]ny other company, firm person or party, including their contractors and/or sub-contractors and/or manufacturers and/or suppliers, with whom the Assured(s) named . . . have entered into written contract(s) in connection with the Project." (*Id.*). A number of insurance companies underwrote the Policy. The Underwriters were subrogated "to all rights which the Assured may have against any person or other entity, other than Principle Assureds and Other Assureds, in respect of any claim or payment." (*Id.* at 57).

The Policy terms and conditions included requiring Chevron to hire a marine warranty surveyor to "review/attend/approve the major marine operations as appropriate." (*Id.* at 4–5). The Policy provided an allowance "of 2.5% on gross premium" for Chevron to hire a marine warranty surveyor and listed surveyors for Chevron to choose from. (*Id.* at 27). The listed candidates were London Offshore Consultants, Global Maritime, Noble Denton and Associates, and Matthews Daniel. (*Id.* at 45). Chevron chose Global Maritime. (*Id.* at 4).

Chevron and American Global Maritime entered into a service contract that required American Global Maritime to "review, witness, oversee, observe, approve and certify facilities as fit for transport, installation and duty pursuant to marine standards and [Chevron's Policy]."

(Docket Entry No. 98-2 at 60). American Global Maritime agreed to review and certify the tendon installation. (*Id.* at 71–72).

On May 16, 2015, American Global Maritime issued a certificate of approval stating that it had "reviewed procedures, checked calculations and inspected preparation for float over and installation of . . . the tendons . . . . [and] the operation is hereby approved." (Docket Entry No. 84 at 246). The tendon installation went forward. On May 29, the tendons were connected to a foundation on the seabed and to the buoyancy modules. Nine of the sixteen tendons sank before they could be secured to the platform. The remaining seven tendons were taken back to shore. An inspection report stated that the clamp bolts had failed, causing the tendons to detach from the buoyancy modules and sink. The Underwriters paid Chevron approximately $500 million under the Policy for the damage the tendon detachment caused.

### b.    Procedural History

The Underwriters sued FloaTEC, Heerema Marine Contractors, McDermott, and Detail Design in the 234th District Court of Harris County, Texas in May 2016. (Docket Entry No. 1-1). The Underwriters alleged that the bolts were underdesigned and failed to account for "static load from offsets caused by loop eddy currents," "fatigue load from 'VIM' and vibration," and "other contributing factors," and that FloaTEC had failed to account for these factors when it approved the bolts. (*Id.* at 14). The Underwriters asserted state-law claims for negligence, gross negligence, products liability, and redhibition. (*Id.* at 16–19). The Underwriters amended the complaint in early October, (*Id.* at 27), removing Detail Design as a defendant and increasing their damages claim, but asserting the same factual allegations and state-law claims. (*Id.* at 33). FloaTEC, Herrema, and McDermott timely removed to the United States District Court for the Southern District of Texas

4

under 28 U.S.C. § 1441(a). (Docket Entry No. 1). Federal subject-matter jurisdiction is based on the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1).

The Underwriters amended their complaint again. (Docket Entry No. 9). The second amended complaint dismissed Herrema and McDermott from the action but joined American Global Maritime as a defendant. (*Id.*). The second amended complaint alleged that FloaTEC:

> failed to adequately account for compression of air in the [buoyancy modules] and drag resulting from VIM vibration in the tendons which caused large loads on the bolts. FloaTEC failed to include sufficient VIV-suppression in the tendon design to dampen or eliminate VIV, which led to fatigue cracks. FloaTEC also failed to provide design and fatigue loads for the [buoyancy modules] and clamp assembly design. FloaTEC failed to properly perform its duties as interface manager, resulting in a significant gap in analysis, design and data exchange between key components and entities involved in the design of the [buoyancy modules] and clamp assembly. These design, engineering and interface failures resulted in the collapse of the tendons and substantial damages to Chevron and ultimately to [the Underwriters].

(*Id.* at 7). The second amended complaint alleged that, as the Chevron-appointed marine warranty surveyor,

> [American] Global Maritime's duties and obligations include, but are not limited to:
> • technical engineering review and approval of design bases, engineering drawings, specifications, plans, procedures; and
> • review and approval of operational aspects of the installation process of the tendons and ETLP.

(*Id.* at 8). This complaint alleged that American Global Maritime had: (1) failed to appoint competent personnel to review and certify the tendon installation and (2) failed to "identify and correct the glaring and obvious design errors that led to the collapse of the tendons." (*Id.*).

The Underwriters asserted subrogated claims against FloaTEC and American Global Maritime. (*Id.* at 10). The Underwriters also claimed to have a direct cause of action against American Global Maritime that arose from its "legal duties to [the] Underwriters." (*Id.*). The Underwriters asserted claims against American Global Maritime for negligence, negligent

5

misrepresentation, breach of fiduciary duty, products liability, and redhibition.

FloaTEC and American Global Maritime moved to dismiss the Underwriters' claims for failure to state a cause of action on which relief can be granted, or to dismiss the litigation and compel arbitration under an arbitration clause in their Contract with Chevron. (Docket Entries No. 29–30). These defendants argued that they were "Other Assured[s]" under Chevron's Policy, and that the Underwriters had waived subrogation rights against Other Assureds. (Docket Entries No. 29-1 at 4–5, 30-1 at 9). In the alternative, FloacTEC and Global Maritime contended that their Contract with Chevron mandated arbitration. (Docket Entries No. 29-1 at 10, 30-1 at 9).

Eight days later, the Underwriters amended the complaint a third time. (Docket Entry No. 32). They added three foreign companies as defendants: Global Maritime Group, Global Maritime Consultancy, and Global Maritime Holdings. (*Id.* at 1). The Underwriters alleged that this Texas court has personal jurisdiction over these companies, both because American Global Maritime's contacts could be attributed to them and because they had sufficient contacts with Texas. (*Id.* at 5–6). The allegations and claims relating to the Project were the same.

This court granted FloaTEC's motion to dismiss and denied American Global Maritime's motions to dismiss and to compel arbitration. (Docket Entry No. 63). The court determined that FloaTEC and American Global Maritime were Other Assureds under the Policy. (*Id.* at 18). The court dismissed the claims against FloaTEC with prejudice because "they are subrogated claims," which the Underwriters had waived. (*Id.*). The dismissal was based on an inability to recover as a matter of law, making pleading amendment futile. The court found, however, that the Underwriters' claims against American Global Maritime were "pleaded as direct tort claims rather than as claims brought as a subrogee of Chevron." (*Id.*). The court ruled that "the Underwriters

have stated a plausible tort claim against American Global Maritime that does not depend on a subrogated assertion of Chevron's rights." (*Id.*). The court's Memorandum and Opinion stated:

> A Louisiana court might reject the Underwriters' direct tort claims against American Global Maritime as impermissible artful pleading, or find that, in this case, public policy strongly militated against concluding that American Global Maritime owed the Underwriters a tort duty. Or a Louisiana court could find that this unusual set of facts justified an extension of the antisubrogation rule to bar any claim that, while not pleaded as a subrogated claim with the insurer standing in the shoes of its insured, would nonetheless have the functional effect of reimbursing an insurer for payments it made under the policy. But American Global Maritime has provided neither authority nor argument to support these approaches. . . . American Global Maritime is free to provide authority and argument in support of its positions at summary judgment.

(*Id.* at 21). The court denied American Global Maritime's motion to compel arbitration because the Underwriters' claims against it did not arise from its Contract with Chevron. (*Id.*).

American Global Maritime answered the third amended complaint, denying the allegations or stating that it had insufficient information to admit or deny them. (Docket Entry No. 64). American Global Maritime admitted that Chevron appointed it as the marine warranty surveyor on the Project and that written contracts existed to that effect. (*Id.* at 6). American Global Maritime's answer asserted as defenses that Chevron or other parties had caused the tendon failure, that Louisiana's anti-subrogation rule barred the claims, and that the tendon detachment resulted from an act of God or from force majeure. (*Id.* at 13–14).

The foreign companies moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). (Docket Entry No. 65). They argued that this Texas court could exercise neither general nor specific personal jurisdiction over them. As to general jurisdiction, the foreign companies alleged that they had no affiliations with the State of Texas. As to specific jurisdiction, they asserted that they lacked sufficient contacts with Texas relating to the Project. The

foreign companies also argued that American Global Maritime's contacts with Texas could not be attributed to them because they are separate and independent entities that have no control over American Global Maritime. To support their arguments, directors from Global Maritime Group, Global Maritime Consultancy, and American Global Maritime submitted affidavits stating that the foreign companies did not work on the Project, do not have contacts with Texas, do not control American Global Maritime, and maintain accounts and records separate from American Global Maritime. (Docket Entries No. 65-3–65-5).

The Underwriters responded, arguing that the foreign companies wholly controlled American Global Maritime, so that its Texas contacts could be imputed to them. (Docket Entry No. 83 at 6). The Underwriters contended that this court has jurisdiction because the foreign companies have marketed themselves and their services or products in Texas, hired Texas residents, sent employees to Texas, and worked on Texas projects. (*Id.*). Lastly, the Underwriters argued that the court should exercise jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because the case arose under federal law and the foreign companies had received service under the Hague Convention and had sufficient contacts with the United States. (*Id.*).

The foreign companies replied, maintaining that they lacked sufficient contacts with either Texas or the United States and that American Global Maritime's contacts could not be imputed to them because they are distinct and separate entities. (Docket Entry No. 100). They attached documents to support dismissal, including American Global Maritime's financial statements for 2013 and 2014, Chevron and American Global Maritime's Contract, board-meeting minutes, and affidavits from board members of Global Maritime Holding and Global Maritime Consultancy. (Docket Entry No. 100-1).

American Global Maritime moved for summary judgment. (Docket Entries No. 97–98). It argued that it did not have a fiduciary relationship with the Underwriters; that it did not owe the Underwriters a tort duty under Louisiana law; and that Louisiana's confusion doctrine extinguished the claims against it. (Document Entry No. 98 at 9–10). American Global Maritime attached the Underwriters's Policy with Chevron and the Contract between Chevron and American Global Maritime. (Docket Entry No. 98-1–98-2).

The Underwriters responded, maintaining that American Global Maritime does not have Other Assured status and that the insurance and indemnity clauses in American Global Maritime's Contract with Chevron disclaimed rights under the Policy relating to the Project. The Underwriters also argue that American Global Maritime breached duties owed to them under negligent-misrepresentation and negligent-professional-undertaking theories and that the anti-subrogation rule does not bar these claims. The Underwriters argue that the confusion doctrine is inapplicable because the duty that American Global Maritime owed them as a marine warranty surveyor differed from the obligation that the Underwriters owed American Global Maritime as insurers.

Each motion, argument, and response is considered below.

### III. The Motion to Dismiss for Lack of Personal Jurisdiction

The foreign companies move to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure. When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of demonstrating sufficient facts to support jurisdiction. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* "When the district court rules on a motion to dismiss for lack of personal

jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper.'" *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (quoting *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994)). The court "must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (quoting *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)). The court is not obligated to credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

### a. The Legal Standards

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant and the exercise of jurisdiction by the forum state is consistent with due process under the United States Constitution. *Delgado v. Reef Resort Ltd.*, 364 F.3d 642, 644 (5th Cir. 2004). The Texas long-arm statute confers jurisdiction to the limits of due process. *Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 385 (5th Cir. 2008); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 17.041–045; *see also Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003). Due process permits the exercise of personal jurisdiction over a nonresident defendant when that defendant has "minimum contacts" with the forum state and the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Wilson*, 20 F.3d at 647). The Underwriters have the burden of demonstrating facts sufficient to establish a *prima face* case for personal jurisdiction over the foreign companies.

"Minimum contacts" can be established through evidence of "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Wilson*, 20 F.3d at 647. A court may exercise specific jurisdiction when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). To determine specific jurisdiction, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Id.* (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Even a single contact can support specific jurisdiction if the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The non-resident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state." *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Specific jurisdiction requires a "sufficient nexus" between the nonresident defendant's contacts forum contacts and at least one of the causes of action. *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987). As part of the minimum-contacts analysis, a court evaluates any contracts, the parties' "actual course of dealing," and the parties' "prior negotiations and contemplated future consequences." *Burger King*, 471 U.S. at 479.

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, general jurisdiction may apply. Due process requires that the foreign

defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction. *Helicopteros Nacionales*, 466 U.S. at 414–15; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987). The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the nonresident defendant than those needed to support specific jurisdiction. *Dalton v. R & W Marine*, 897 F.2d 1359, 1362 (5th Cir. 1990). "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'" *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (quoting *Stuart*, 772 F.2d at 1191).

"[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002). "Likewise, when a group of affiliated corporations constitutes a single business enterprise, a court may 'disregard the concept of corporate separateness and extend liability to each of the affiliated corporations' for the purpose of preventing fraud or achieving equity." *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 335 (5th Cir. 2007) (quoting *Brown v. Auto. Cas. Ins. Co.*, 644 So. 2d 723, 727 (La. App. 1st Cir. 1994); *Lee v. Clinical Research Ctr. of Fla., L.C.*, 889 So. 2d 317, 323 (La. App. 4th Cir. 2004)); *see Bona Fide Demolition & Recovery, LLC v. Crosby Constr. Co. of La., Inc.*, 690 F. Supp. 2d 435, 443–44 (E.D. La. 2010).

### b. Analysis

The parties do not dispute that the court has personal jurisdiction over American Global

Maritime. The parties do dispute that American Global Maritime's contacts can be imputed to the foreign companies, or that the foreign companies have sufficient Texas contacts under either Texas's long-arm statute or Federal Rule of Civil Procedure 4(k)(2). (Docket Entry No. 83 at 3–4). Addressing each of the Underwriters' theories in turn, the analysis set out below concludes that the Underwriters fail to make out a *prima facie* case for personal jurisdiction. The court denies the Underwriters' request for discovery because the discovery requested would not yield information sufficient to make out a *prima facie* case. The court therefore grants the foreign companies' motion to dismiss under Federal Rule of Civil Procedure 12(b)(2).

### 1.    Contact Imputation: The Law That Applies

The threshold issue is which state's law applies to the issue of imputing contacts from the resident to nonresident defendants. "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). "This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Id.* (quoting FED. R. CIV. P. 4(k)(1)(A)).

A federal court sitting in Texas applies Texas law on personal jurisdiction and, in this case, applies Louisiana's substantive law under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A). (Docket Entry No. 63 at 3–4). The choice-of-law question is whether Texas or Louisiana law applies to the issue of imputing contacts from American Global Maritime to the foreign companies. *Cf. Adm'rs of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x 326, 330 n.5 (5th Cir. 2011) ("Where federal jurisdiction is based on diversity of citizenship, this court applies the

applicable state law to determine whether contacts should be imputed to a parent company due to an alter-ego or agency relationship.").  Texas has adopted the conflict-of-law principles in the Restatement (Second) of Conflict of Laws, which directs courts to apply the law of the state that has the "most significant relationship" with the "particular substantive issue." *Ford Motor Co. v. Leggat*, 904 S.W.2d 643, 646–47 (Tex. 1995) (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)).  It appears that the Texas conflict rules apply to determine which state's law applies.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

The Fifth Circuit has not resolved this "complicated" question.  *Jackson v. Tanfogolio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010).  This court need not resolve the issue if the state laws "relevant to the set of facts are the same, or would produce the same decision in the lawsuit." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 529 (5th Cir. 2014) (quoting *Phillips Petro. Co. v. Shutts*, 472 U.S. 797, 839 n.20 (1985)); *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005).  The law of the forum state applies if there is no conflict between the substantive state law.  *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002).  The Texas and Louisiana laws on imputing contacts are so similar that the court need not decide if Louisiana rather than Texas law applies.

In Texas, a subsidiary corporation's contacts can be imputed to its parent corporation when the subsidiary "is organized and operated as a mere tool or business conduit" of the parent.  *Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 85 (Tex. App.—Houston [1st. Dist.] 2008, no pet.) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)).  To succeed under this alter ego theory, the plaintiff seeking to establish personal jurisdiction must show that the "parent controls the internal business operations and affairs of the

subsidiary." *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 175 (Tex. 2007) (quoting *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002)). The evidence must show that "the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *BMC Software*, 83 S.W.3d at 799.[1] It must demonstrate a "'plus' factor, 'something beyond the subsidiary's mere presence within the bosom of the corporate family.'" *PHC-Minden*, 235 S.W.3d at 176 (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)).

"All of the relevant facts and circumstances surrounding the operations of the two corporations must be examined to determine whether two separate and distinct corporate entities exist." *Foley v. Trinity Indus. Leasing Co.*, 314 S.W.3d 593, 605 (Tex. App.—Dallas 2010, no pet.). The Texas Supreme Court has identified four relevant factors: "the amount of the subsidiary's stock owned by the parent corporation, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent's control over the general policy and administration of the subsidiary." *PHC-Minden*, 235 S.W.3d at 175 (quoting 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4). "The first three factors evaluate whether corporate structure is such that excessive control could occur, while the fourth measures actual control." *TMX Fin. Holdings, Inc., v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 8 (Tex. App.—Houston [1st Dist.] 2016, no pet.).[2] The fourth factor "is most closely aligned with the ultimate question the factors address: actual control."

---

[1] *See Knight Corp. v. Knight*, 367 S.W.3d 715, 730 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[T]he parent and subsidiary can be merged for jurisdictional purposes only if the subsidiary is not maintained as a distinct corporate entity such that the separation between the parent and subsidiary is 'pure fiction.'" (quoting *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335 (1925))).

[2] Texas has not decided whether "a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure." *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 87 (Tex. 2003).

*Id.*

Louisiana follows the general rule that corporations are distinct legal entities, "separate from the individuals who comprise them." *Riggins v. Dixie Shoring Co., Inc.*, 590 So. 2d 1164, 1167 (La. 1991). This fiction may be ignored when the corporation proves to be "the 'alter ego' of the shareholder." *Id.* at 1168. Under this theory, a court may pierce the corporate veil in "situations where fraud or deceit has been practiced by the shareholder acting through the corporation," or "the corporation ceases to be distinguishable from its shareholders." *Id.*

Piercing the corporate veil permits a court to "impute a corporation's contacts to its shareholders" for jurisdictional purposes. *Bona Fide Demolition*, 690 F. Supp. 2d at 443 (citing *Patin*, 294 F.3d at 653). In determining whether to pierce the veil, Louisiana courts examine the totality of circumstances, taking into consideration any commingling of funds, failure to follow corporate formalities, undercapitalization, failure to keep separate accounts and records, and failure to hold regular shareholder and director meetings. *Riggins*, 590 So. 2d at 1168. The purpose of veil piercing is to prevent the corporate form from being used to "defeat public convenience, justify wrong, protect fraud, or defend crime." *Smith v. Cotton's Fleet Serv., Inc.*, 500 So. 2d 759, 762 (La. 1987).

Louisiana law favors maintaining the corporate fiction. "Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances." *Riggins*, 590 So. 2d at 1168; *see Korson v. Indep. Mall I, Ltd.*, 593 So. 2d 981, 984 (La. App. 5th Cir. 1992) ("Only exceptional circumstances warrant the radical remedy of piercing the corporate veil."). Absent allegations of fraud or deceit, a plaintiff has the "heavy burden of proving that the shareholders disregarded the corporate entity to such an extent

that it ceased to become distinguishable from themselves." *Riggins*, 590 So. 2d at 1168.

Louisiana courts may also impute contacts from a domestic to a foreign defendant under a single-business-enterprise theory, under which a corporation is shown to be the "alter ego, agent, tool or instrumentality of another corporation." *Interstate Battery Sys. of Am., Inc. v. Kountz*, 78 So. 3d 200, 203 (La. App. 3d Cir. 2011) (quoting *Dishon v. Ponthie*, 918 So. 2d 1132, 1135 (La. App. 3d Cir. 2005)). The contacts for personal jurisdiction "can be imputed through a parent-subsidiary relationship." *Stewart v. Ruston La. Hosp. Co., LLC*, No. 14-00083, 2014 WL 1772945, at *3 (W.D. La. May 2, 2014) (quoting *Dickson Marine*, 179 F.3d at 338). The single-business-enterprise theory can be used to "fuse either affiliated or unaffiliated corporations, but not to impute corporate jurisdictional contacts to shareholders." *Bona Fide Demolition*, 690 F. Supp. 2d at 444. A court may disregard "the legal fiction of a distinct corporate entity" when "a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation" or, in other words, when "one corporation is wholly under the control of another." *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257 (La. App. 1st Cir. 1991).

A court considers the totality of the circumstances to determine whether one corporation controls another, focusing on 18 factors identified as helpful in many cases. *Dishon*, 918 So. 2d at 1135–36; *Green*, 577 So. 2d at 257–58. These factors include: stock ownership; common directors or officers; unified administrative control; directors and officers of one corporation who act independently of corporate interests; asset commingling; undercapitalization; one corporation that causes another to be incorporated; one corporation pays salaries or other expenses of another corporation; one corporation receives business only through an affiliated corporation; one corporation uses the property of another as its own; failure to follow corporate formalities; common

employees; one corporation's employees render services on behalf of another corporation; common offices; centralized accounting; undocumented transfers of funds between corporations; unclear allocation of profits and losses between corporations; and excessive fragmentation of a single enterprise. *Dishon*, 916 So. 2d at 1135–36 (quoting *Green*, 577 So. 2d at 257–58). This list is neither exhaustive nor dispositive. *Id.* The record must show "an additional or a 'plus' factor, 'something beyond the subsidiary's mere presence within the bosom of the corporate family.'" *Dickson Marine*, 179 F.3d at 338 (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)).

The Fifth Circuit, after analyzing Louisiana law, found that "the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a 'single business enterprise' are similar." *Tanfoglio Giuseppe*, 615 F.3d at 587 (quoting *Green*, 577 So. 2d at 257–58). The factors include:

> common ownership, directors and officers, employees, and offices; unified control; inadequate capitalization; noncompliance with corporate formalities; centralized accounting; unclear allocation of profits and losses between corporations; one corporation paying the salaries, expenses, or losses of another corporation; and undocumented transfers of funds between entities.

*Id.*

Under both Texas and Louisiana law, contacts may be imputed from a corporation that controls the other such that the corporations have ceased to be distinct. Both Louisiana and Texas also permit a court to impute contacts when one corporation operates as a "tool," instrumentality, or business conduit of another corporation. *Kountz*, 78 So. 3d at 203; *Sinopec Overseas Oil & Gas*, 260 S.W.3d at 85. Both Texas and Louisiana law require courts to examine all the circumstances in deciding whether to impute contacts. Each state's law requires courts to consider ownership,

18

separateness, corporate formalities, and control. Neither state's law permits a plaintiff to impute contacts unless a "'plus' factor" exists, "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Dickson Marine*, 179 F.3d at 338 (quotation omitted); *PHC-Minden*, 235 S.W.3d at 176. These similarities make choosing between Texas and Louisiana law unnecessary because the outcome would be the same under either. *Chinese-Manufactured Drywall*, 753 F.3d at 529.[3]

### 2.      Contact Imputation: Analysis

The court begins with the presumption that American Global Maritime is a separate and independent corporation from the foreign companies. *See TMX Fin. Holdings*, 515 S.W.3d at 8; *Riggins*, 590 So. 2d at 1167. The Underwriters have the burden of establishing that American Global Maritime's contacts with Texas or the United States can be imputed to the foreign companies. *BMC Software*, 83 S.W.3d at 798; *Fausse Riviere, LLC v. Snyder*, 211 So. 3d 1188, 1193 (La. App. 1st Cir. 2017).

The Underwriters submitted American Global Maritime's Articles of Incorporation, showing that it was incorporated in Texas on April 21, 1997. (Docket Entry No. 84 at 47). Global Maritime Holdings is incorporated in Great Britain and owns all of American Global Maritime's shares and all the shares of Global Maritime Consultancy, another British corporation. (Docket Entry No. 65-3 at 2–3). Global Maritime Group is incorporated in Norway and owns all the shares of Global Maritime Holdings. (*Id.* at 4). These companies have some common directors and officers, (*id.* at 5–8), but neither stock ownership nor common directors and officers is enough to impute American

---

[3]  The parties cited Fifth Circuit cases applying Texas law in support of their positions. (Docket Entries No. 65, 83, 100).

Global Maritime's contacts to the foreign companies. *See PHC-Minden*, 235 S.W.3d at 175 ("[A] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors and officers, or an exercise of the control that stock ownership gives to stockholders." (quoting *Gentry v. Credit Plan Corp. of Hous.*, 528 S.W.2d 571, 573 (Tex. 1975))); *Riggins*, 590 So. 2d at 1168 ("The fact that one individual owns a majority of stock in the corporation does not in itself make that individual liable for corporate debts."). The Underwriters must point to a "plus factor, something beyond the subsidiary's mere presence within the bosom of the corporate family." *Dickson Marine*, 179 F.3d at 338 (quotation omitted).

The Underwriters and American Global Maritime submitted affidavits, business records, and other evidence. These documents reveal that American Global Maritime is an independent enterprise that cooperates with its parent, grandparent, and sister companies. American Global Maritime has a separate office in Houston;[4] keeps its own corporate records, including financial statements, accounting documents, and meeting minutes; separately hires and pays its employees; separately owns property; leases office space; holds director and shareholder meetings; has directors who are tasked with pursuing its interests; is sufficiently capitalized; has its own insurance coverage; submits bids on contracts and negotiates their terms, as evidenced by its contract with Chevron; schedules and supervises contractor and employee work; and independently contracts with employees from affiliated companies. This record evidence shows that American Global Maritime respects corporate formalities and operates as an independent corporation, outside the direct control of the foreign companies.

---

[4] The Underwriters contend that "Global Maritime" has a single headquarters in Stavanger, Norway because the "Global Maritime" website identifies it as the "home" office. But American Global Maritime does not list Stavanger as its corporate headquarters in official documents. It always lists Houston.

The Underwriters make much of the companies' reference to themselves as "Global Maritime."  The Underwriters submitted an Assumed Name Certificate filed in Texas, stating that American Global Maritime could do business as "Global Maritime"; documents relating to previous litigation in which American Global Maritime referred to itself as "d/b/a Global Maritime"; a certificate issued to "Global Maritime"; the companies' shared "Global Maritime" website; an online energy directory listing of "American Global Maritime Inc" as a branch of "Global Maritime AS"; and marketing materials showing that the companies both market as "Global Maritime."  (Docket Entry No. 84 at 50, 257, 265, 306–57).  According to the Underwriters, the companies' use of "Global Maritime" suggests that they disregard corporate formalities.  But using "Global Maritime" as a shorthand company name or label "is no evidence" that the companies fail to "observe corporate formalities," because "Global Maritime" forms "part of their names."[5]  *BMC Software*, 83 S.W.3d at 800; *see PHC-Minden*, 235 S.W.3d at 175 ("Whether two related entities share a common name . . . does not affect whether each has sufficient contacts with the forum for jurisdictional purposes."). In legally binding circumstances—like contracts, financial statements, insurance policies, invoices, certifications, board meeting minutes, and board resolutions—American Global Maritime used its formal and unique name: "American Global Maritime Inc."  (Docket Entries No. 83 at 50, 102, 105, 222–23, 225–28, 238–56).  Its informal references to itself as "Global Maritime" do not support an inference that corporate formalities were ignored.

---

[5]  The Underwriters also attached social-media profiles of individuals who describe themselves as working at "Global Maritime" or "Global Maritime Group," but who live in Houston.  (Docket Entry No. 84 at 277–98).  These representations, without more, have little probative value on the issues of inter-corporate control or independence.  There is no basis to infer that the companies dictate what employees represent on personal web pages or that their self-descriptions reflect corporate structure.  This record does not reveal whether the employees list their employer as "Global Maritime" because it is shorthand for American Global Maritime or because they are employees of a single global entity.

The Underwriters contend that the foreign companies control American Global Maritime's day-to-day operations. They contend that the foreign companies are "consolidated under a global management team," (Docket Entry No. 32 at 5–7); that an employee of Global Maritime Group, "J. Linde," worked on the Big Foot Project, (Docket Entry No. 83 at 20); and that the foreign companies sent employees to Houston to help on other projects. (*Id.* at 16). The record undermines these allegations. Officers and directors of the foreign companies submitted affidavits declaring that the companies did "not control the day-to-day activities" of American Global Maritime. (Docket Entries No. 65-3–65-5; 100-1 at 1–5; 100-2; 100-3; 100-4). An affidavit of a former American Global Maritime vice-president states that the only contact between the management of American Global Maritime and of the foreign companies concerned soliciting business at conferences held in Houston and London once or twice a year. (Docket Entry No. 84 at 31–35). His affidavit also states that American Global Maritime billed for the services of the employees that the foreign companies sent to Houston, which suggests that American Global Maritime, not the foreign companies, controlled those employees' work. (*Id.* at 34). The record shows that American Global Maritime independently contracted with and paid for "J. Linde" to work on the Project. (Docket Entry No. 100-1 at 111–13). These circumstances support an inference of independence, not of control.

The Underwriters contend that the foreign companies and American Global Maritime share funds through loans and a cash-pool agreement. American Global Maritime offers and receives "borrowings from its parent company," which are "unsecured, do not accrue interest, and have no set repayment term." (Docket Entry No. 100-1 at 15). But American Global Maritime records the amounts due and payable in its separate financial statements. In 2013 and 2014, American Global Maritime "had $911,425 and $1,412,905, respectively, of accounts payable to companies related by

common ownership." (*Id.* at 15). During those years, American Global Maritime "had $1,561,696 and $1,287,246, respectively, of accounts receivable due from companies related by common ownership." (*Id.*). Similarly, in 2015 and 2014, American Global Maritime "had approximately $410,000 and $911,000, respectively, of accounts payable to companies related by common ownership" and accounts receivable of "209,000 and $1,562,00, respectively." (*Id.* at 32–33). In his affidavit, American Global Maritime's former vice-president stated that "funds were generally treated as a pool for the benefit of the worldwide company," but "the funds would normally be repaid." (Docket Entry No. 84 at 35). While one Global Marine company might make a loan to another, the borrowing entity tracked, reported, and "normally" repaid those loans. This does not suggest blurred corporate lines.

The Underwriters next point to a cash-pool agreement and argue that the foreign companies treated American Global Maritime's property as their own by using shares as collateral. Global Maritime Holdings entered into an agreement with DNB Bank ASA for access to a credit facility of 80,000,000 Norwegian Krone. (Docket Entry No. 84 at 167). The credit facility was secured with Global Maritime Holdings' assets, including its shares in American Global Maritime. As part of this agreement, American Global Maritime was required to pledge DNB Bank a security interest in its shares. (*Id.* at 91, 102). American Global Maritime would receive access to the credit facility through a credit-facility agreement stating that "[t]he companies in the cash pool agreement are jointly liable for the draw down on the facility." (*Id.* at 77, 91, 102). American Global Maritime's board met and approved the pledge agreement and the credit-facility agreement's terms. The board determined that the pledge agreement and credit-facility agreement were "advisable and in the [c]ompany's best interests, [would] benefit the [c]ompany, directly and indirectly, and [were]

necessary or convenient to the conduct, promotion or attainment of the [c]ompany's business." (Docket Entry No. 100-1 at 57–58). With board approval, American Global Maritime agreed to the credit-facility agreement and in return received access to credit. The credit-facility agreement does not show that Global Maritime Holdings exercised control over American Global Maritime.

The Underwriters' allegations regarding consolidated financial statements, annual management meetings, common policies, and financial monitoring do not establish the control necessary to impute jurisdictional contacts from American Global Maritime to the foreign companies. *PHC-Minden*, 235 S.W.3d at 176 ("Appropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies." (quoting 16 MOORE'S FEDERAL PRACTICE § 108.42(3)(b))). Referring to subsidiaries in a financial report does not support an inference that a parent or related corporation is exercising abnormal control over a subsidiary or affiliate. *See BMC Software*, 83 S.W.3d at 799–800 ("[R]eferencing . . . subsidiaries in [an] annual report is a common business practice, which the Internal Revenue Service, the SEC, and generally accepted accounting principles recommend.").

The Underwriters assert that American Global Maritime is undercapitalized, offering its insurance coverage as proof. The Underwriters allege that American Global Maritime received a fee "in excess of $2 million" but had only "one professional liability policy with a limit of liability of $1,000,000." (Docket Entry No. 83 at 19–20). This, the Underwriters claim, "is evidence of undercapitalization." (*Id.* at 20). American Global Maritime had professional services coverage of $1 million per incident and umbrella coverage for $5 million per incident. (Docket Entry No. 84 at 222). That gave American Global Maritime $6,000,000 in coverage because the umbrella coverage

would apply after the professional services coverage was depleted.  *See N. Am. Capacity Ins. Co. v. Colony Specialty Ins. Co.*, 273 F. Supp. 3d 711, 715 (S.D. Tex. 2017) ("An umbrella policy is designed to cover situations where primary insurance policies are exhausted without covering the full loss.").  American Global Maritime could pay a judgment of up to $6,000,000 for performing services worth approximately $2,000,000.  It was sufficiently capitalized for the Project.

As to capitalization for operations, American Global Maritime's financial statements reveal that, while it operated at a loss in 2015 and 2014, it had sufficient capital to meet its expenses, including employee salaries and benefits, contract labor, leases on office space and equipment, and other business costs.  (Docket Entry No. 100-1 at 28, 33–36).[6]  American Global Maritime had sufficient funds to operate.  *See Matter of Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991) ("The concept of undercapitalization normally refers to the insufficiency of the capital contributions made to a corporation.").

The Underwriters have not pointed to or presented evidence showing a blurring of corporate lines between American Global Maritime and the foreign companies.  The relationship between American Global Maritime and the foreign companies is that of affiliated but separate entities.  The Underwriters have not shown a plus factor sufficient to carry their burden of proof.  There is no basis to impute American Global Maritime's contacts to the foreign companies, under either Texas or Louisiana law.

### 3.  Specific Jurisdiction

---

[6]  In 2015 and 2014, American Global Maritime had revenues of $9,930,808 and $9,090,968, respectively, but costs of $7,970,527 and $7,501,300.  (Docket Entry No. 100-1 at 28–35).  It also had administrative costs of $3,176,400 and $2,470,469.  (*Id.*).  Global Maritime Group's financial statement for 2015 shows that the entire group had a loss of 212,680,298 Norwegian Krone that year.  (Docket Entry No. 84 at 66).

"Specific jurisdiction . . . depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 221–22 (5th Cir. 2012) (quoting *Goodyear Dunlop Tires*, 564 U.S. at 919). "A court may exercise specific jurisdiction when: (1) the nonresident defendant purposefully avails itself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum." *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 369 (5th Cir. 2010) (citing *Freudensprung*, 379 F.3d at 343). "The 'purposeful availment' element ensures that a defendant will not be haled into court in a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or the unilateral activity of another person or third party." *Id.* (citing *Burger King*, 471 U.S. at 475).

The Underwriters allege that the foreign companies "collaborated and provided technical advice and support for the Project, and employees from other Global Maritime offices worked on the Big Foot [P]roject, with some sent to work from the Houston office to provide services directly to Chevron for the [P]roject." (Docket Entry No. 32 at 7). Standing alone, these allegations are insufficient to support specific personal jurisdiction over the foreign companies. *See Walden*, 571 U.S. at 283–84 ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984))).

The Underwriters make two specific allegations: (1) American Global Maritime was listed as an approved marine warranty surveyor because the foreign companies marketed their services to London underwriters; and (2) the Global Maritime Group sent J. Linde, a Global Maritime Group

employee, to Texas to work on the Project. The foreign companies' marketing efforts in London are not contacts with Texas. As to the second allegation, the record shows that American Global Maritime independently contracted with Linde. (Docket Entry No. 100-1 at 111–13).[7] Because Linde separately contracted with American Global Maritime, his work in Texas is not a contact between the foreign companies and Texas.

The court cannot exercise specific personal jurisdiction over the foreign companies because the Underwriters have failed to demonstrate that they have sufficient contacts with Texas relating to the Project.

### 4. General Jurisdiction

The Underwriters assert that the foreign companies' "affiliations" with Texas or the United States "are so 'continuous and systematic' as to render them essentially at home" in Texas or the United States. *Goodyear Dunlop Tires*, 564 U.S. at 919 (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 317 (1945)). This "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston*, 523 F.3d at 609–10 (quoting *Subermersible Sys., Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir. 2001)). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction." *Id.* (quoting *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002)).

General jurisdiction is examined by "evaluating contacts of the defendant with the forum

---

[7] American Global Maritime's contract with Linde states: "It is agreed that all the work is carried out under a contract for services and that there is no Contract of Employment between the parties." (Docket Entry No. 100-1 at 112).

over a reasonable number of years, up to the date the suit was filed." *Access Telecomm., Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999). "[V]ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 610.

### i. The Texas Long-Arm Statute

In the third amended complaint, the Underwriters alleged that the foreign companies: "regularly advertise, solicit business, target customers, negotiate and execute contracts, and provide services in Texas, through American Global Maritime's Houston office." (Docket Entry No. 32 at 5–6). This assertion is insufficient for general jurisdiction because these points are unmoored to the extent, duration, or frequency of the foreign companies' contacts with Texas. *Johnston*, 523 F.3d at 610. These assertions also rely on American Global Maritime's contacts with Texas, although it is a separate company for personal jurisdiction purposes.

In response to the motion to dismiss, the Underwriters argued that: the foreign companies recruited a Texas citizen to incorporate American Global Maritime; the foreign companies' officers "regularly meet and market their services with [American Global Maritime] officers both for Texas-based projects, and to Texas companies that may have projects overseas"; the foreign companies "specifically marketed with [American Global Maritime] representatives to London underwriters responsible for insuring marine and energy work in Texas and offshore Texas to add Global Maritime to the approved list of [marine warranty surveyors]"; and the foreign companies sent employees to work on at least six projects in the Gulf of Mexico between 1997 and 2017. (Docket Entry No. 83 at 28–30).

The record does not support many of these factual allegations, and none by itself or in

combination with the others is sufficient to show general personal jurisdiction over the foreign companies in Texas. The evidence offered that officers or employees of the foreign companies' made "regular" trips to Houston comes from the affidavit of American Global Maritime's former vice-president. (Docket Entry No. 84 at 31–35). His affidavit states that officers from the foreign companies traveled to Houston each year for the Offshore Technology Conference, and sometimes for a Houston Marine Insurance Seminar. (*Id.* at 34). At most, the affidavit shows that the foreign companies sent officers to Houston once or twice a year, not on a frequent basis, and does not show that the foreign companies' officers went to Houston for other reasons. The evidence of marketing efforts by the foreign companies to underwriters based and located in London does not show the foreign companies' contacts with Texas, given the lack of evidence that the foreign companies sought to do business in Texas.

In his affidavit, the former vice-president of American Global Maritime stated that the foreign companies sent employees to Texas to help American Global Maritime work on three projects between 1997 and 2004. (*Id.*). But the affidavit supports the argument that those employees worked for American Global Maritime, not the foreign companies, and that American Global Maritime included their work "in the invoices to clients from the Houston office as though they were Houston employees." (*Id.*). The work was for American Global Maritime, not the foreign companies; it is at best a weak contact between the foreign companies and Texas.

The Underwriters assert that "'Global Maritime' was the approved [marine warranty surveyor] on three Gulf of Mexico projects between 2011 and 2017," and that "[the foreign companies] are likely to have either procured this U.S. work or lent employees to the Houston office to complete the work, and would have received compensation from this Texas work." (Docket Entry

No. 83 at 29–30). But the Underwriters neither point to nor submit supporting evidence showing that the foreign companies sent their own employees to Houston and paid for the work those employees did in Houston.

The Underwriters produced a press release showing that the U.S. Coast Guard certified Global Maritime Consultancy to "provide Subchapter M compliance services as a Third Party Organization." (Docket Entry No. 84 at 305). This press release, without more, does not show sustained contacts between the foreign companies and Texas. The press release states that "Global Maritime" provides services in the United States. (*Id.*). It is unclear which Global Maritime corporation—American or foreign—provides those services, what the services are, or how frequently they were provided.

Lastly, the Underwriters cite a press release stating that "Global Maritime Consultancy & Engineering" completed a project carried out by the "Houston team." (*Id.* at 344). Again, it is unclear even which entity performed this work. The imprecise language means that these press releases provide little support for the argument that Global Maritime Consultancy contracted for or worked on Texas projects and, even if they did, they do not show contacts of a continuous and systematic nature.

The record shows that the foreign companies hired someone or some entity to incorporate American Global Maritime, sent officers to international conferences held once or twice a year, lent an unspecified number of employees to American Global Maritime under unknown conditions, had a U.S. certification, and may have contracted to provide services for one project. This evidence does not establish that the foreign companies' "affiliations" with Texas were "so continuous and systematic as to render them essentially at home" in Texas. *Goodyear Dunlop*, 564 U.S. at 919

30

(quotation omitted). This Texas court cannot properly exercise general personal jurisdiction over the foreign companies based on this record.

### ii. Federal Rule of Civil Procedure 4(k)(2)

When no single state of the United States has jurisdiction over a foreign defendant, Federal Rule of Civil Procedure 4(k)(2) permits a federal court sitting in any state to exercise personal jurisdiction over that defendant, if it is consistent with due process and if the defendant was properly served. The Rule provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

FED. R. CIV. P. 4(k)(2). Under this language, a federal court in any state may exercise personal jurisdiction over "foreign defendants for claims *arising under federal law* when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of any particular state." *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 720 (5th Cir. 1996) (emphasis in original). The court has to conduct the "now familiar minimum contacts analysis." *Id.* at 723. Because the foreign companies lack contacts relating to the Project, the Underwriters must show "continuous and systematic contacts with the United States as a whole." *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651–52 (5th Cir. 2004).

This case arises under federal law. The Underwriters allege that the foreign companies have been served under the Hague Convention. They argue that the foreign companies have continuous

and systematic contacts with the United States as a whole because they:

> directly market and provide international [marine warranty surveyor] services relied upon by energy companies, vessel owners, insurers, banks, investors, shippers, brokers and seamen throughout the United States and across the worldwide maritime and energy community. They tout the global availability of their agents, engineers and [marine warranty surveyor services] for marine and energy work throughout the United States, for which Texas is a major hub. They regularly compete for and conduct marine and offshore work in Texas and Louisiana, and would expect to be haled into a U.S. court for disputes arising out of their work. It is that very substantial worldwide operations and widespread reliance that defendants rely upon for their economic success.

(Docket Entry No. 83 at 33). These assertions do not show general personal jurisdiction.

The Underwriters' only specific assertion is that Global Maritime Group worked on a wind farm located off the Rhode Island coast. (*Id.* at 31–32). As evidence, the Underwriters point to a press release from Global Maritime's website. The press release reads: "hear how Global Maritime is working with a leading operator to provide Marine Warranty services for an offshore wind farm." (Docket Entry No. 84 at 341). The press release does not state that Global Maritime Group itself provided services to or worked on the wind farm. For all it discloses, American Global Maritime might have provided the services or done the work.

The Underwriters have failed to produce or point to evidence supporting a *prima facie* showing that the foreign companies have contacts with the United States sufficient for this court to exercise jurisdiction under Rule 4(k)(2).

### c. Jurisdictional Discovery

In deciding whether personal jurisdiction exists over a nonresident defendant, the court may rely on written submissions, hold an evidentiary hearing, or allow discovery on personal jurisdiction. *See Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 173 (5th Cir. 1994). "When the defendant disputes the factual bases for jurisdiction, . . . the court may receive interrogatories, depositions, or

'any combination of the recognized methods of discovery' to help it resolve the jurisdictional issue."

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). An

evidentiary hearing is appropriate when the jurisdictional facts are separate from the facts on the

merits. *Id.* Discovery is appropriate when it could reveal information relevant to determining

whether the court has personal jurisdiction. "[D]iscovery on matters of personal jurisdiction . . .

need not be permitted unless the motion to dismiss raises issues of fact." *Kelly v. Syria Shell Petro.*

*Dev. B. V.*, 213 F.3d 841, 855 (5th Cir. 2000) (quotation omitted). Discovery rulings on personal

jurisdiction are reviewed for abuse of discretion and "will not be disturbed ordinarily unless there

are unusual circumstances showing a clear abuse." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d

266, 270 (5th Cir. 2006) (quoting *Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982)).

The parties have submitted over 400 pages of affidavits, financial documents, marketing

materials, contracts, board minutes, and other documents. The Underwriters nonetheless want

discovery on the foreign companies' Texas contacts and corporate structure. They ask to depose:

- Egil Kvannli, the chief executive officer of Global Maritime Group;
- Neil Scott Walker, the regional manager of Global Maritime Consultancy;
- Satyajit Kar, the marine operations manager for American Global Maritime;
- Alberto Morandi, a former president of American Global Maritime;
- Thomas Smith, a former engineering manager of American Global Maritime.

(Docket Entry No. 83 at 34–35). Three of these individuals—Egil Kvannli, Neil Scott Walker, and

Satyajit Kar—have already submitted affidavits. (Docket Entries No. 65-3–65-5). Each stated that

the foreign companies neither exercise control over American Global Maritime nor provided

services relating to the Project. (*Id.*). Their depositions are unnecessary and unlikely to yield new

information.

As to Alberto Morandi and Thomas Smith, the Underwriters state that they expect

depositions of these individuals to show that the foreign companies did business in Texas and met with Texas-based customers to market "Texas and worldwide business."[8]  (Docket Entry No. 83 at 35).  The Underwriters have already submitted an affidavit from Michael A. Jacobs, a former vice-president of American Global Maritime, who stated that officers from the foreign companies came to Texas once or twice a year to attend international conferences held in Houston.  (Docket Entry No. 84 at 34).  He said nothing about regular or frequent marketing in Houston.  (*Id.*).  It is at best unclear what additional depositions would add.  As to doing business in Texas, the depositions of Alberto Morandi and Thomas Smith would not likely yield relevant information because the parties agree that American Global Maritime does business in Texas.  The affidavits from the foreign companies' directors and officers state that neither Global Maritime Holdings nor Global Maritime Group do business in Texas.  The affidavits state that Global Maritime Consultancy does not have an office in the United States and provided no services or support on the Big Foot Project.  The record lacks evidence that the depositions of Global Maritime Consultancy employees, who presumably live and work in Europe, would yield information, necessary to make the depositions consistent with the limits on discovery, including proportionality.

The court denies the Underwriters' request for depositions or other jurisdictional discovery as unnecessary and unjustified in light of the extensive record the parties have submitted.

## IV.    The Motions for Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact

---

[8] The Underwriters believe the depositions will show that the foreign companies set American Global Maritime's "policies strategy, and budgets."  (Docket Entry No. 83 at 34).  As discussed, these functions are appropriate parental functions that do not support the alter-ego or single-business-entity theories.  *PHC-Minden*, 235 S.W.3d at 176 ("Appropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies."  (quoting 16 MOORE'S FEDERAL PRACTICE § 108.42(3)(b))).

and the movant is entitled to judgment as a matter of law." *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (quotation omitted); *see also* FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Savant v. APM Terminals*, 776 F.3d 285, 288 (5th Cir. 2014)). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). A fact is material if "its resolution could affect the outcome of the action." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United*

*States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007).

### a. The Products Liability Claim

The Underwriters allege that American Global Maritime violated the Louisiana Products Liability Act, La. Stat. Ann. §§ 9:2800.54. That Act provides: "The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." *Id.* § 9:2800.54(A). The Act defines a "manufacturer" as: (1) "a person or entity who is in the business of manufacturing a product for placement into trade or commerce"; (2) "[a] person or entity who labels a product as his own or otherwise holds himself out to be the manufacturer of the product"; (3) "[a] seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage"; (5) "[a] manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer"; or (4) "[a] seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer." *Id.* § 9:2800.53(1).

Because the complaint does not allege that American Global Maritime manufactured or sold the bolts or held itself out as their manufacturer, this claims fails. American Global Maritime's motion for summary judgment on this claim is granted.

### b.    The Redhibition Claim

The Louisiana Civil Code includes a provision that a "seller warrants the buyer against redhibitory defects, or vices, in the thing sold." LA. CIV. CODE ANN. art. 2520. "Redhibition is the remedy when the defect in the thing sold renders it absolutely useless or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased the thing had he known of the vice." *PPG Indus. v. Indus. Laminates Corp.*, 664 F.2d 1332, 1335–36 (5th Cir. 1982). "[A]n action in redhibition entitles the buyer to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any . . . substantial defects." *Aucoin v. S. Quality Homes, LLC*, 984 So. 2d 685, 692 (La. 2008).

The Underwriters allege that American Global Maritime breached the warranty against redhibitory defects because the defects in its products "existed at the time of delivery and rendered the products useless, or their use so inconvenient, that it must be presumed that Chevron would not have purchased or used the products had it known of the defects." (Docket Entry No. 32 at 20). The Underwriters assert this as among their subrogated claims. The Underwriters waived subrogation rights against Other Assureds, including American Global Maritime. (Docket Entry No. 63 at 17–18; Docket Entry No. 98-1 at 57). The motion for summary judgment is granted as to this claim.

### c.    The Breach of Fiduciary Duty Claim

The Underwriters allege that American Global Maritime owed the Underwriters a fiduciary duty as the marine warranty surveyor Chevron appointed. They allege that American Global

Maritime "undertook acts and/or omissions that were inconsistent with its fiduciary duty." (Docket Entry No. 32 at 18). The court previously found that Louisiana law applies to the substantive issues. (Docket Entry No. 63 at 4–5).

A person or entity owes a fiduciary duty when "a fiduciary relationship [exists] between the parties." *Scheffler v. Adams & Reese, LLP*, 950 So. 2d 641, 647 (La. 2007). "Generally, whether a fiduciary duty exists, and the extent of that duty, depends upon the facts and circumstances of the case." *Id.* A person or entity acts in a fiduciary capacity "when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other." *Id.* (quoting *State v. Hagerty*, 205 So. 2d 369, 374–75 (La. 1967)). "The defining characteristic of a fiduciary relationship, therefore, is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor." *Id.* at 648. A contract may establish a fiduciary relationship,[9] but the existence of a contract does not itself "elevate a contractual relationship to a fiduciary relationship between the parties." *Terrebonne Concrete, LLC v. CEC Enters., LLC*, 76 So. 3d 502, 510 (La. App. 1st Cir. 2011).

---

[9] *See CLB61, Inc. v. Home Oil Co., LLC*, 233 So. 3d 656, 661 (La. App. 1st Cir. 2017) (plaintiff established a fiduciary relationship based on a "10-year contractual relationship" with Chevron); *La. State Univ. Sys. Research & Tech. Found. v. Qyntessa Biologics, LLC*, 168 So. 3d 468, 474 (La. App. 1st Cir. 2014) ("Although not every contractual relationship involves a fiduciary relationship, the defining characteristic of the latter is a special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor."); *TTV, LLC v. Simmons*, 58 So. 3d 684, 691 (La. App. 3d Cir. 2011) (a fiduciary relationship existed where a consultant agreed to set up a project for a client); *Novelaire Techs., LLC v. Harrison*, 994 So. 2d 57, 64 (La. App. 5th Cir. 2008) (an employee had a fiduciary duty based on obligations in his employment contract). *But see Ray Gibbins Certified Welders, Inc. v. Griggs*, 543 So. 2d 68, 75 (La. App. 1st Cir. 1989) ("The general nature of the relation between an insurer and an insured is purely a contractual one even where the policy must in form comply with statutory or standard policy provisions." (quoting 42 AM. JUR. 2D *Insurance* § 159 (1982)).

American Global Maritime did not have a contractual or other legal relationship with the Underwriters. The Underwriters required Chevron to select a marine warranty surveyor for the Project and listed surveyors from which Chevron could choose. (Docket Entry No. 98-1 at 4, 45). The Policy required the appointed marine warranty surveyor to approve environmental criteria; survey marine vessels, barges, and equipment; issue certificates for transportation and installation; and review and approve procedures and engineering studies. (*Id.* at 4–5). These services were required "to meet the terms and conditions of Big Foot Construction-All-Risk (CAR) policy, Big Foot Installation Job Specifications and Standard Industry practice." (*Id.* at 5). Under the Policy, the marine warranty surveyor had to provide "[s]ervices as and when required by Chevron" and could "report to and receive guidance directly from the Underwriters" only "under instructions from the Big Foot [Project] Installation Management Team." (*Id.*). Chevron could not change the surveyor, once chosen, without "the express and prior agreement of the lead underwriter(s)." (*Id.* at 4).

Chevron picked American Global Maritime to serve as the marine warranty surveyor. (Docket Entry No. 98-2 at 2). American Global Maritime did not sign or endorse the Underwriters's Policy. Instead, American Global Maritime contracted directly with Chevron. (*Id.*). The contract detailed American Global Maritime's duties to Chevron. American Global Maritime had to inspect, review, witness, and monitor "activities and documents to certify to [Chevron] and [Chevron's] insurance underwriters that the marine components and facilities meet industry accepted standards, maritime laws and codes applicable to marine facilities and are likewise sea-worthy for transportation, installation and operation." (*Id.* at 51). American Global Maritime agreed to work "in accordance with [Chevron's] insurer's underwriting requirements and good industry practice"

and to "coordinate and interface with [Chevron], [Chevron's] insurance underwriters, [Chevron's] freight forwarder, installation contractors, vessel owner/operators, fabricators and others to perform its review and/or approval responsibilities." (*Id.* at 61–62). As to the tendons and buoyancy modules, Chevron specified that American Global Maritime must:

[a]ttend on the installation vessel for the installation of the 16 tendons

1) Witness dynamic positioning in field tests
2) Attend daily progress meetings with the installation coordinator
3) Attend "decision to proceed" review meetings with the installation contractor and review selection of appropriate design and operational environmental criteria for installation site and adequacy of environmental information to be supplied prior to and during the operations.
4) Issue Certificates of Approval to proceed for individual tendon installations
5) Witness the installation of the tendons

(*Id.* at 71–72). The certificates that American Global Maritime issued provided:

This is to certify that this office, *acting on behalf of Chevron*, has reviewed procedures, checked calculations and inspected preparation for float over and installation of FPU Big Foot to the tendons at Walker Ridge Block 29 offshore Louisiana. Procedures and preparations are satisfactory and, subject to operations being carried out in accordance with the reviewed procedures, the operation is hereby approved.

(Docket Entry No. 84 at 246 (emphasis added)).

The Contract provided that "[n]o person who is not a Party to this Contract has any rights under this Contract or may enforce any provision in this Contract." (Docket Entry No. 98-2 at 43). The Contract limited the disclosure of reports, findings, and certifications to Chevron. Official communications from American Global Maritime were to be "solely through [Chevron's representative] or his delegate." (*Id.* at 62). The contractual obligations ran only between American Global Maritime and Chevron. American Global Maritime had no contractual or other legal relationship to the Underwriters. The Underwriters have not identified promises that American

Global Maritime made to them. While American Global Maritime had to comply with the Underwriters' requirements, that obligation was a contractual duty owed to Chevron, not to the Underwriters. No fiduciary relationship exists between American Global Maritime and the Underwriters. Summary judgment is granted as to this claim.

### d. The Negligence Claims

In its July 2017 memorandum and opinion, the court addressed whether American Global Maritime had Other Assured status, concluding that "American Global Maritime [is an] Other Assured[ ] under the Policy, and nothing in [its] contract[ ] with Chevron or the applicable law limits [its] right to assert the subrogation waiver as a defense." (Docket Entry No. 63 at 15). The court also determined that the subrogation waiver did not impact the Underwriters' direct tort claims and that the anti-subrogation rule bars only subrogated actions that an insurer asserts against a coinsured. (*Id.* at 18–19). These rulings remain; the record and arguments provide no basis to reverse them.

This court has determined that American Global Maritime's services fell "within the Policy's coverage." (Docket Entry No. 63 at 17). The Policy "insures against *all risks* of physical loss of and/or physical damage" for "works executed anywhere in the world in the performance of all contracts relating to the Project." (Docket Entry No. 98-1 at 61 (emphasis added)). By insuring against "all risks," the Policy also covered American Global Maritime's negligence. The Fifth Circuit interprets "all risk" policies under Louisiana law as creating:

> a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.

*U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 461 (5th Cir. 1982) (quoting *Dow Chem.*

*Co. v. Royal Indem. Co.*, 635 F.2d 379, 387 (5th Cir. 1981)).[10]  A fortuitous event "is dependent on chance."  *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 431 (5th Cir. 1980) (quoting RESTATEMENT OF CONTRACTS § 291, cmt. a (1932)).  Losses "occasioned by negligence" can "be fortuitous."  *Id.* (quoting RESTATEMENT OF CONTRACTS § 291, cmt. a).

The Underwriters assert a  tort claim against American Global Maritime, which arises outside the Policy,[11] to recover money paid to Chevron for the loss of the tendons.  American Global Maritime argues that Louisiana's confusion doctrine forecloses the Underwriters' claims.  (Docket Entry No. 98 at 21).  Under the well-named confusion doctrine, "[w]hen the qualities of obligee and obligor are united in the same person, the obligation is extinguished by exhaustion."  LA. CIV. CODE ANN. art. 1903.  "[A]n obligation is said to be extinguished by confusion when a person is placed in the position of owing the obligation to himself."  *Langley v. Police Jury of Calcasieu Parish*, 201 So. 2d 300, 304 (La. App. 3d Cir. 1967) (en banc) (quotation omitted); *see, e.g.*, *Matter of Dibert, Bancroft & Ross Co., Ltd.*, 117 F.3d 160, 170–71 (5th Cir. 1997) (confusion arises, for example, when a "promissory note that is secured by [a] mortgage is acquired by its maker" or "an encumbered building is acquired by the mortgagee" (emphasis omitted)).  "For confusion to occur the same person must acquire the full and perfect ownership of both sides of the obligation."  *Langley*, 201 So. 2d at 305 (quotation omitted).  The confusion doctrine may extinguish either a

---

[10]  *See also Katrina Canal Breaches*, 495 F.3d at 208; *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 504 (5th Cir. 2000).

[11]  "[I]t is a fundamental principle of insurance law that an insurer may not sue its own insured on the insurance policy."  *United States v. St. Bernard Parish*, 756 F.2d 1116, 1127 (5th Cir. 1985); *see Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1177 (5th Cir. 1992) ("This Circuit has overwhelmingly upheld the fundamental principle of insurance law which states that an insurer may not sue its own insured to recover under the insurance policy.").  "While public policy does not allow an insurer to sue its own assured on the insurance policy, the law recognizes that there may be causes of action by an insurer outside the policy."  *Peavey Co.*, 971 F.2d at 1177 (citing *St. Bernard Parish*, 756 F.2d at 1127).

contractual or "delictual cause of action."[12]  *McAuslin v. Grinnell Corp.*, No. 97-775, 2000 WL 1191073, at *3 (E.D. La. Aug. 22, 2000).

In *A & M Pest Control Service, Inc. v. Fejta Construction Company, Inc.*, 338 So. 2d 946, 947–48 (La. App. 4th Cir. 1976), an insurance company insured a building owner and the contractor who built it.  The contractor had installed a sprinkler system that broke and caused water damage a year after installation.  *Id.*  The insurer paid the owner and asserted a subrogated claim against the contractor.  *Id.* at 950–51.  The Louisiana Court of Appeal affirmed the claim's dismissal because the "qualities of debtor and creditor became fused in the same person, the insurer, and in such instance, confusion extinguishes the obligation."  *Id.* at 952.

Here, the Policy covered damage to the Big Foot Project caused by negligence.  The Underwriters sue American Global Maritime, an Other Assured, for negligently causing damage to the Project.  If the Policy requires the Underwriters to indemnify American Global Maritime for that damage, the confusion doctrine applies because the Underwriters have tort claims and a duty to indemnify.[13]  While the Underwriters bring direct, not subrogated, claims against American Global Maritime, this does not change the Policy provision that the Underwriters insured American Global

---

[12]  "Delict" is Latin for a wrongful action or, in other words, a tort.  *See Delict*, Black's Law Dictionary (7th ed. 1999) ("A delict is a civil wrong.  It is an infringement of another's interests that is wrongful irrespective of any prior contractual undertaking to refrain from it." (quotation omitted)).

[13]  This case differs from *McAuslin v. Grinnell Corporation*, 2000 WL 1191073, at *1.  In *Grinnell*, a fire destroyed a warehouse that a city had constructed and leased to a company.  *Id.*  The company's insurer brought a subrogated negligence claim against the city, and the city asserted a cross-claim against the company.  *Id.*  The company argued that confusion extinguished the city's claim because it would require the company "to repay the very insurance money that it had received."  *Id.* at *3. The district court determined that the city did not have "full and perfect ownership of both sides of the same obligation" because the "[c]ity's tort indemnification claim seeks recovery based on [the company's] own negligence, a separate obligation from the [c]ity's obligation not to cause the fire."  *Id.*  The present case differs because the Underwriters have a duty to indemnify the very negligence claims they bring against American Global Maritime.

Maritime for the negligence alleged in their claims. As in *A & M Pest Control*, the Underwriters have insured American Global Maritime against the claims they assert, unifying the roles of obligee and obligor.

In this case, however, the confusion doctrine may not extinguish the Underwriters' claims. The Policy permits Other Assureds to alter coverage through contract:

> The interest of the Other Assured(s) shall be covered throughout the entire Policy Period of their direct participation in the venture, *unless specific contract(s) contain provisions to the contrary.* The rights of any Assured under this insurance shall only be exercised through the Principal Assureds. Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms, conditions and exclusions in the Policy.

(Docket Entry No. 98-1 at 57 (emphasis added)). Through its contract with Chevron, American Global Maritime could have agreed to alter or waive the Policy's coverage. If it did, the confusion doctrine would not apply.

### 1.      The American Global Maritime Contract with Chevron

The Contract selects the law of the State "where the Services are performed." (Docket Entry No 98-2 at 39). The Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A), directs a court to apply the law of the "adjacent" state to activities on a continental shelf. The court applies Louisiana law.

Under Louisiana law, "'[c]ontracts have the effect of law for the parties,'" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." *Clovelly Oil Co., LLC v. Midstates Petro. Co., LLC*, 112 So. 3d 187, 192 (La. 2013) (quoting *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 258 (La. 2010)). "The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself." *Id.* When a contract's words are

44

"clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046. "Common intent is determined . . . in accordance with the general, ordinary, plain and popular meaning of the words used in the contract." *Clovelly*, 112 So. 3d at 192. A "contract 'must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance.'" *Id.* (quoting *Prejean v. Guillory*, 38 So. 3d 274, 279 (La. 2010)). The court must consider contractual provisions "in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Id.* (citing LA. CIV. CODE ANN. art. 2050).

American Global Maritime agreed to indemnify Chevron for "damage or loss aris[ing] out of th[e] Contract," up to "$5,000,000." (Docket Entry No. 98-2 at 28). This indemnification obligation applied regardless of Chevron's negligence. (*Id.* at 31). American Global Maritime also agreed to maintain insurance "during the time that Services [were] being performed." (*Id.* at 33). The Contract required American Global Maritime to maintain the following coverages:

> Commercial General Liability (Bodily Injury and Property Damage) Insurance, including the following supplemental coverages: Contractual Liability to cover the liabilities assumed in this Contract; Products and Completed Operations; Explosion, Collapse and Underground Hazards; and Sudden and Accidental Pollution. The Policy territory coverage must include all areas where the Services are to be performed. The policy limits must not be less than US$2,000,000 combined single limit per occurrence.

(*Id.*). The commercial liability policy that American Global Maritime agreed to obtain was to name Chevron as an "additional insured[ ] to the extent of the liabilities assumed by [American Global Maritime] under th[e] Contract." (*Id.* at 34). Chevron could claim up to $5,000,000 under the commercial liability policy for damage or loss arising from the Contract. The Contract required that the commercial liability policy include a provision stating: "the insurance is primary with respect

to all insureds, including additional insureds, and that no other insurance carried by [Chevron] will be considered as contributory insurance for any loss." (*Id.*). The Contract stated that the insurance coverage American Global Maritime had to obtain did not "limit or reduce [its] liability and indemnity obligations." (*Id.* at 33).

The Underwriters allege that the loss of the tendons arose out of American Global Maritime's negligence in performing services under its Contract with Chevron. Did the commercial liability policy cover damage resulting from negligence? If so, and if it forbid American Global Maritime from using Chevron's Policy as "contributory insurance," the Underwriters have no duty to indemnify American Global Maritime against tort claims from damage to the Project. (*Id.* at 34). The confusion doctrine would not extinguish the Underwriters' negligence action. Because the record does not contain the commercial liability policy's terms, the court cannot decide this question. A genuine factual dispute material to deciding whether American Global Maritime waived coverage under Chevron's Policy precludes summary judgment on this issue.

### 2. The Duties of Care

If supplementation of the record reveals that American Global Maritime waived coverage, the Underwriters might proceed on claims of negligent misrepresentation and negligent professional undertaking. "A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008). Duty is generally a legal question. *Boykin v. Louisiana Transit Co., Inc.*, 707 So. 2d 1225, 1231 (La. 1998). "In deciding whether to impose a duty in a particular case, Louisiana courts examine 'whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed [the plaintiff] a duty." *Audler*, 519 F.3d at 249 (quoting *Faucheaux v.*

*Terrebonne Consol. Gov't*, 615 So. 2d 289, 292 (La. 1993)).

The court first examines whether American Global Maritime owed the Underwriters duties under theories of negligent representation or negligent professional undertaking. It did. The court next analyzes whether there are genuine factual disputes material to deciding whether American Global Maritime breached those duties. The court finds the present record inadequate to resolve those questions and denies summary judgment on these issues.

### i.      Negligent Misrepresentation

"Louisiana is a jurisdiction which allows recovery in tort for purely economic loss caused by negligent misrepresentation where privity of contract is absent." *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1014 (La. 1993). For the Underwriters to assert this claim, "there must be a legal duty on the part of [American Global Maritime] to supply correct information, there must be a breach of that duty, and the breach must have caused plaintiff damage." *Id.* at 1015. In *Barrie*, the Louisiana Supreme Court considered whether "a termite inspector has a duty to exercise reasonable care and competence in obtaining and communicating information in a termite inspection report, so as to protect third persons for whose benefit and guidance the information was sought and supplied, and who may detrimentally rely on its contents thereby suffering pecuniary loss." *Id.* at 1008. The court determined that "Louisiana law provides such a duty," reasoning that the plaintiffs "detrimentally relied upon the contents of the report, even though the purchasers [were] not a party to the contract and have had no direct or indirect contact with the termite inspector, [and] the termite inspector supplied it to facilitate the sale so as to make the purchasers the intended users of the report." *Id.*

In reaching this conclusion, the Louisiana Supreme Court emphasized that negligent

misrepresentation turns on a defendant's knowledge that the plaintiff "would detrimentally rely" on its representations.[14]  *Id.* at 1011–14, 1016.  To determine whether a  negligent misrepresentation action exists under *Barrie*, four factors must be considered:

> First, is whether the tortfeasor could expect that the plaintiffs would receive and rely upon the information.  Second, is whether the plaintiffs are members of the limited group for whose benefit and guidance the report was contracted and supplied.  Third, is whether the report is prepared in the context of a business transaction for which the alleged tortfeasor received compensation.  Fourth, is whether extending tort liability would serve public policy.

*Audler*, 519 F.3d at 250.  As to the third factor, "the necessary inquiry is not only whether the alleged tortfeasor was compensated for composing a report or conducting an inspection, but rather, whether the need to obtain an inspection or report arose out of an obligation to facilitate a transaction."  *Nogess v. Poydras Ctr., LLC*, No. 16-15227, 2018 WL 2970847, at *7 (E.D. La. June 13, 2018).

This case meets the first three *Barrie* factors.  American Global Maritime knew that the Underwriters relied on their approvals and certifications; the Policy and Contract show that the Underwriters were members of the limited group for whose benefit and guidance those approvals and certifications were contracted and supplied; and American Global Maritime performed the services for compensation and to fulfill Chevron's Policy obligation to the Underwriters.

The Policy required a marine warranty surveyor to "review/attend/approve the major marine operations."  (*Id.* at 4).  It required the surveyor to "provide the [s]ervices as and when required by

---

[14]  *See Barrie*, 625 So. 2d at 1016 ("The duty was owed to the Barries even though they were a third party to V.P., without privity of contract or direct or indirect contact, because they were known to V.P. as the intended users of the report."); *In re FEMA Trailer Formaldehyde Prods. Liability Litig.*, 838 F. Supp. 2d 497, 508 (E.D. La. 2012) ("One exception where Louisiana courts have extended a contractual duty to provide accurate information to third persons outside the contract is where the third person is known to the defendant to be the intended end-user of the report or information it was hired to produce.").

Chevron" and allowed the surveyor to "report to and receive guidance directly from the [U]nderwriters" where "applicable and under instructions from the Big Foot Installation Management Team." (*Id.* at 5). Chevron chose American Global Maritime as the surveyor and, in the Contract, laid out American Global Maritime's duties:

> [American Global Maritime] shall perform inspections, reviews, witnessing and surveillance of activities and documents to certify to [Chevron] and [Chevron's] insurance underwriters that the marine components and facilities meet industry standards, maritime laws and codes applicable to marine facilities and are likewise sea-worthy for transportation, installation and operation.

(Docket Entry No. 98-2 at 51).

American Global Maritime agreed to "coordinate and interface with [Chevron], [Chevron's] insurance underwriters, [Chevron's] freight forwarder, installation contractors, vessel owners/operators, fabricators and others to perform its review and/or approval responsibilities." (*Id.* at 61). American Global Maritime agreed to perform the services called for "in accordance with [Chevron's] underwriting requirements and good industry practice." (*Id.* at 62). While American Global Maritime lacked a legal relationship with the Underwriters, the Contract shows that American Global Maritime knew that the Underwriters would receive and rely on its services. The Policy and Contract show that Chevron contracted with American Global Maritime to provide the services because the Underwriters wanted to reduce the risks of insuring the Project. Chevron compensated American Global Maritime. Three of the *Barrie* factors are met.

The final factor requires asking if recognizing a duty of care would serve public policy. It would. In *Barrie*, the Louisiana Supreme Court asked whether finding a duty of care would "promote[ ] the maintenance of a high quality of services" and "impart[ ] confidence in those services to the contracting party and to those persons who, due to current business practices, are

expected to receive and rely upon the contents of the report." *Barrie*, 625 So. 2d at 1017–18. The record shows that the purpose of appointing "[a] marine warranty surveyor" is to "protect the interest of the underwriter." (Docket Entry No. 107 at 10–11). The marine warranty surveyor "should at all times act as an independent unbiased entity." (*Id.*). Recognizing that American Global Maritime has a duty to use reasonable care in obtaining and evaluating the facts in making the certifications helps to maintain the high-quality marine warranty surveyor services, encourage surveyors to remain independent and unbiased, and impart confidence on the underwriters who rely on their services.[15] The complexities and risks of the projects the surveyors often work on underscores the importance of the quality of their work.

The four *Barrie* factors support recognizing a tort duty in this case. American Global Maritime owed the Underwriters a duty "to use reasonable care and competence in obtaining or ascertaining facts for and/or in communicating the facts or opinion" underlying its reports and certifications. *Barrie*, 625 So. 2d at 1016.

### ii.     Negligent Professional Undertaking

The Underwriters also cite cases addressing negligent professional undertakings. The Louisiana courts recognize a cause of action for "negligent professional undertaking." *Lathan Co., Inc. v. State, Dep't of Educ., Recovery Sch. Dist.*, 237 So. 3d 1, 6 (La. App. 1st Cir. 2017), *writ denied* 237 So. 3d 1191 (La. 2018). This cause of action turns on the "degree of economic control"

---

[15] Courts in several maritime law cases have held that marine warranty surveyors owed tort duties. *See Tucker Energy Servs., Inc. v. Noble Denton & Assocs., Inc*, No. 98-1126, 2003 WL 24108197, at *27 (S.D. Tex. Mar. 31, 2003) ("A plaintiff shipowner can recover from a defendant marine surveyor 'if plaintiff can prove by a preponderance of the evidence its claim of negligence or breach of warranty of workmanlike performance . . . , and that those acts proximately caused' the damage." (quotation omitted)); *Commonwealth Ins. Co. v. Am. Global Maritime Inc.*, No. 00-868, 2001 WL 333148, at *5 (E.D. La. Apr. 4, 2001) ("[G]enuine issues of material fact exist regarding the negligence . . . on the part of Global Maritime in approving the towage configuration . . . in its capacity as warranty surveyor.").

that one party exercises over another by agreeing to perform a professional service. *Harris v.*

*Builders, LLC v. URS Corp.*, 861 F. Supp. 2d 746, 753 (E.D. La. 2012). Courts have held that

plaintiffs stated a negligent professional undertaking claim against architects and engineers based

on the plans and specifications prepared for contractors, who relied on them. *See id.* at 753; *Colbert*

*v. B.F. Carvin Constr. Co.*, 600 So. 2d 719, 725 (La. App. 5th Cir. 1992), *writ denied*, 604 So. 2d

1311 (La. 1992); *S.K. Whitty & Co., Inc. v. Laurence L. Lambert & Assocs.*, 576 So. 2d 599, 601–02

(La. App. 4th Cir. 1991); *Standard Roofing Co. of New Orleans v. Elliot Constr. Co., Inc.*, 535 So.

2d 870, 880 (La. App. 1st Cir. 1988). A court must balance factors to determine whether this action

exists on a "case-by-case basis." *Lathan Co.*, 237 So. 3d at 6.

> The determination whether in a specific case the defendant will be held liable to a
> third person not in privity is a matter of policy and involves the balancing of various
> factors, among which are the extent to which the transaction was intended to affect
> the plaintiff, the foreseeability of harm to him, the degree of certainty that the
> plaintiff suffered injury, the closeness of the connection between the defendant's
> conduct and the injury suffered, the moral blame attached to defendant's conduct,
> and the policy of preventing future harm.

*Id.* (quoting *Colbert*, 600 So. 2d at 725) (emphasis omitted). In *Lathan Company*, 237 So. 3d at 3,

a school district hired a contractor to renovate a school, an architect to draft the designs, and a

company to manage the project. The contractor sued the manager in tort, alleging delays in

responding to design faults and failures to disclose mold conditions that made it incur additional

costs. *Id.* at 3–4. After reviewing the manager's contractual duties, which included reviewing the

designs and the design documents, the Louisiana Court of Appeal determined that "although [the

manager] was not in direct contractual privity with [contractor], [the manager] must be deemed and

held to know that its services were not only for the protection or interests of the [school district] but

also third parties, including, specifically, [the contractor]." *Id.* at 8–9. "[I]t was foreseeable and to

a degree certain that [the contractor] would suffer economic harm if [the manager] failed to perform, or negligently performed, many of its professional duties." *Id.* at 9.

In another case, *Harris Builders*, 861 F. Supp. 2d at 748, a builder contracted to construct a warehouse. An engineering firm served as the project's "engineer, consultant, [and] construction manager." *Id.* The builder sued the engineering firm, asserting that it had failed to manage the project efficiently and to develop plans complying with industry standards. *Id.* According to the builder, these failures caused material losses in completing the warehouse. *Id.* The builder and firm did not have a contract. *Id.* The trial court stated that "whether styled [as] 'negligent professional undertaking' or simply 'negligence,' Louisiana law recognizes a cause of action for negligence by [the builder], as general contractor, against [the firm]." *Id.* at 753. The court reasoned:

> [The firm's] construction plan preparations and instructions to [the builder] to redo certain work were acts that [the firm] had to have known would directly affect [the builder]. It was foreseeable and fairly certain that [the builder] would suffer economic harm if [the firm] managed the project poorly, and [the firm's] development of project specifications directly affected the work [the builder] performed. In short, [the builder] asserts a high degree of economic control by [the firm] . . . .

*Id.* at 753.

All the factors but one[16] support recognizing a claim of negligent professional undertaking. Chevron and American Global Maritime entered into their Contract because the Underwriters demanded it. Chevron provided Global Maritime's reviews and certificates to the Underwriters. The reviews and certificates were necessary for coverage under the Policy. Chevron entered the Contract to benefit itself and the Underwriters by reducing the Project risks.

If American Global Maritime was negligent in approving the Project's specifications,

---

[16] The Underwriters do not allege intentional misconduct.

52

seaworthiness, and construction, the economic harm to the Underwriters was foreseeable. The Underwriters did not have representatives on the Project site. They looked to American Global Maritime's certificates to ensure that Chevron and its contractors followed the "underwriting requirements and good industry practice." (Docket Entry No. 98-2 at 62). The Underwriters depended in part on American Global Maritime to reduce the Project risks. While American Global Maritime's negligence did not make the Underwriters' harm certain, it increased the likelihood that the Underwriters would have to cover a loss. American Global Maritime's alleged negligence in approving the tendons, buoyancy modules, and bolts bears a close connection to the harm the Underwriters incurred when they paid for the lost tendons.

Had American Global Maritime refused to issue a certificate of approval for the tendon installation, Chevron would not have proceeded. If American Global Maritime was negligent, as the Underwriters allege, that negligence contributed to the Underwriters' loss. Finding that American Global Maritime owed the Underwriters a duty in tort gives marine warranty surveyors like American Global Maritime an incentive to perform their services with care, especially when the potential losses are enormous.

The factors lean one way. American Global Maritime owed the Underwriters a duty of reasonable care in inspecting, reviewing, witnessing, and monitoring the Project to decide whether to certify that "the marine components and facilities meet industry standards, maritime laws and codes applicable to marine facilities and are likewise sea-worthy for transportation, installation and operation." (*Id.* at 51).

### 3.      The Breach of Duties

The record shows that American Global Maritime issued a certificate of approval for the

installation of the tendons and floats and another for the "seafastening of various components/materials." (Docket Entry No. 84 at 240, 246). A field survey log shows that American Global Maritime met with "key entities to discuss loop current[s]" and participated in the "Go-no go meeting" to install the tendons. (*Id.* at 230). After installation, 9 of the 16 tendons sank to the ocean floor. (Docket Entry No. 107 at 322). But the Underwriters have not pointed to evidence of what American Global Maritime did that fell below the standard of care or whether its acts or omissions caused the tendons to sink. The court denies the motion for summary judgment on these issues relating to American Global Maritime's negligence.

The Underwriters ask the court to defer ruling on summary judgment because "no discovery has taken place pending this [c]ourt's ruling on [the foreign companies'] Rule 12 motions to dismiss." (Docket Entry No. 106 at 12). Given that the issues presented in the summary judgment motion are issues of law, the court declines to do so. The court denies the motion for summary judgment as to negligence, but permits the parties to move again for summary judgment on the issues that cannot be determined on the present record. *See* Fed. R. Civ. P. 56(d)(1). The court hopes that the rulings will help the parties tailor the scope of discovery.

## VI.    Conclusion

The court grants the foreign companies' motion to dismiss for lack of personal jurisdiction, without prejudice, and denies the Underwriters' request to defer ruling on the motion for summary judgment. (Docket Entries No. 65, 104). The court grants American Global Maritime's motion for summary judgment on the products liability, redhibition, and fiduciary duty claims, with prejudice, but denies the motion as to American Global Maritime's negligence, without prejudice. (Docket Entry No. 97). The parties must appear in **Courtroom 11B** on **November 6, 2018, at 10:30 a.m.**

for a scheduling hearing.

SIGNED on October 16. 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge