**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LLOYD'S SYNDICATE 457, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-16-3050 |
| | § | |
| FLOATEC LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This case arises from a complex insurance arrangement memorialized in complex policies filled with conditions, limits, cross-references, exclusions, and exceptions to exclusions. In 2014, Chevron U.S.A., Inc. was building an oil-drilling platform, known as the "Bigfoot Project," in the Gulf of Mexico. Chevron insured the Bigfoot Project with an Offshore Construction Risk Policy issued by Aon Limited and underwritten by a number of other insurance companies.[1]

Each underwriter took some Project risk in exchange for a share of the premium. This arrangement spread the Project's estimated $2 billion risk across the Underwriters. The Underwriters required Chevron to hire a marine warranty surveyor to review and certify the Project's specifications and materials before the installation. Chevron hired American Global Maritime under a Service Contract to meet this coverage condition. The Offshore Construction Risk Policy insured American Global Maritime as an "Other Assured" against "all risks" of

---

[1] The insurance companies, collectively, the "Underwriters," are: Lloyd's Syndicates; Arch Insurance Company (Europe) Limited; Axis Specialty Europe Limited; General Security Indemnity Company; Houston Casualty Company; Hyundai Marine and Fire Insurance Company; Infrassure Limited; International General Insurance Company Limited; International Insurance Company of Hannover Limited; Lancashire Insurance Company (UK) Limited; Mitsui Sumitomo Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Sompo Japan Insurance Incorporated; Statoil Forsikring A.S.; Tokio Marine and Nichido Fire Insurance Company Limited; and Zurich Insurance PLC UK.

physical damage or loss to the Bigfoot Project, including from American Global Maritime's own negligence. (Docket Entry No. 98-1 at 56–57, 61).

The Service Contract required American Global Maritime to review the procedures for installing the Bigfoot Project on the ocean floor, including by checking the calculations and inspecting the parts, then certifying the installation as ready to proceed. American Global Maritime issued the certificates. The Bigfoot Project's installation went wrong, and parts sank to the ocean floor. The Underwriters paid Chevron $500 million for the loss, then sued Chevron's contractors, including American Global Maritime, alleging negligence in certifying the installation.

After a wave of dispositive motions and rulings, American Global Maritime is the last defendant, and only negligence claims remain. American Global Maritime has moved for summary judgment on the remaining claims, and the Underwriters have responded. (Docket Entry Nos. 123–24, 134). After the Fifth Circuit decided an appeal affirming another defendant's dismissal, the Underwriters and American Global Maritime submitted supplemental briefing. (Docket Entry Nos. 138, 142). This court has carefully considered the pleadings; the motion, response, and supplemental briefing; the court's previous decisions; the Fifth Circuit's opinion; the voluminous record, including the policies and contracts; and the applicable law.

Because the undisputed facts show no basis for recovery against American Global Maritime as a matter of law, judgment is so granted to American Global Maritime, and final judgment is separately entered. The reasons for these rulings are detailed below.

## I.    Background

The facts and procedural history have been explained at length and in detail. (*See* Docket Entry No. 111). Because the other defendants have been dismissed and only negligence claims

remain against American Global Maritime, this brief background is tailored to that party and those claims.

In 2014, Chevron contracted with a number of companies to build an oil-drilling platform with tension legs approximately 225 miles south of New Orleans, Louisiana. The Bigfoot Project was designed to reach through 5,185 feet of water to oil reserves beneath the seabed. Sixteen steel tethers, or "tendons," would secure the platform to the seabed. While the tendons were being installed, they would be clamped to buoyance modules to keep them afloat. Each clamp had 12 bolts.

Chevron obtained insurance for the Bigfoot Project through the Offshore Construction Risk Policy issued by Aon. This Offshore Construction Risk Policy "insure[d] against *all risks* of physical loss" and "damage" for "works executed anywhere in the world in the performance of all contracts relating to the Project." (Docket Entry No. 98-1 at 61 (emphasis added)). The covered "activities" included:

> [p]roject studies, engineering, contingencies, design, project management, procurement, fabrication, construction, prefabrication, storage, load out, loading/unloading, transportation by land, sea or air . . . , towage, mating, installation, burying, hook-up, connection and/or tie-in operations, testing and commissioning, existence, initial operations and maintenance, testing, trials, pipelaying, trenching, and commissioning.

(*Id.* at 56). The Offshore Construction Risk Policy listed Chevron as a "Principal Assured[]" and defined "Other Assureds" to include "Project managers" and "[a]ny other company, firm person or party, including their contractors and/or sub-contractors and/or manufacturers and/or suppliers, with whom the Assured(s) named . . . have entered into written contract(s) in connection with the Project." (*Id.*).

As to Other Assureds' coverage, the Offshore Construction Risk Policy stated that:

> [t]he interest of the Other Assured(s) shall be covered throughout the entire Policy Period for their direct participation in the venture, unless specific contract(s) contain provisions to the contrary. The rights of any Assured under this insurance shall only be exercised through the Principal Assureds. Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms, conditions and exclusions in the Policy.

(*Id.* at 57).

The Underwriters were subrogated "to all rights which the Assured may have against any person or other entity, other than Principal Assureds and Other Assureds, in respect of any claim or payment." (*Id.*). The Underwriters waived "rights of subrogation against any Principal Assured(s) and/or Other Assured(s)." (*Id.*). The Offshore Construction Risk Policy was "primary to, and [would] receive no contribution from, any other insurance maintained by or for the Principal Assured(s) and/or Other Assured(s)." (*Id.* at 69).

The Offshore Construction Risk Policy required Chevron to hire a marine warranty surveyor to "review/attend/approve the major marine operations as appropriate." (*Id.* at 4–5). Chevron chose American Global Maritime. (*Id.* at 4). Chevron and American Global Maritime entered into a Service Contract that required American Global Maritime to "review, witness, oversee, observe, approve[,] and certify facilities as fit for transport, installation[,] and duty pursuant to marine standards and [the Offshore Construction Risk Policy]." (Docket Entry No. 98-2 at 60, 71–72). American Global Maritime indemnified Chevron for up to $5,000,000 of "damage or loss" arising out of the Service Contract, "prorated to the extent that [American Global Maritime's] negligence or fault contributed to the damage or loss." (*Id.* at 28). The Service Contract required American Global Maritime to obtain commercial general liability policy; to name Chevron and its affiliates as additional insureds under the commercial general liability insurance; and for the commercial general liability insurance to be "primary with respect to all

insureds, including additional insureds, and that no other insurance carried by [Chevron] will be considered as contributory for any loss." (*Id.* at 33–34). The commercial general liability insurance policy would not "limit or reduce [American Global Maritime's] liability and indemnity obligations" to Chevron. (*Id.* at 33).

American Global Maritime obtained a Commercial General Liability Policy that had a $2 million limit and made Chevron an "Additional Insured." (Docket Entry No. 124-1 at 6, 11). The Commercial General Liability Policy covered bodily injury and property damage that American Global Maritime became "legally obligated to pay as damages." (*Id.* at 13). The Commercial General Liability Policy did not cover damages from American Global Maritime's "professional services," but it did cover "operations in connection with construction work performed by [American Global Maritime] or on [its] behalf." (*Id.* at 52). As to Additional Insureds, such as Chevron, the Commercial General Liability Policy was "primary and NON-CONTRIBUTORY," meaning "that other available insurance will apply as excess and will not contribute as primary to the insurance provided by this policy." (*Id.* at 30–31, 35 (emphasis in original)).

American Global Maritime also had a Premier Design Professionals Liability Insurance Policy. This Professional Liability Policy covered bodily injury or property damage from "any actual or alleged act, error or omission committed or attempted solely in the performance of or failure to perform Design Professional Services." (Docket Entry No. 124-2 at 8, 11, 14). "Design Professional Services" meant those services "in the Insured's capacity as an architect, engineer, land surveyor, landscape architect, construction manager, interior designer, land planner, space planner, expert witness, or technical consultant" in any of those areas. (*Id.* at 14). American Global Maritime's Professional Liability Policy was "in excess of the amount of . . . any other insurance or indemnification available to the Insured." (*Id.* at 31–32).

On May 16, 2015, American Global Maritime issued a certificate of approval stating that it had "reviewed procedures, checked calculations and inspected preparation for float over and installation of . . . the tendons . . . . [and] the operation is hereby approved." (Docket Entry No. 84 at 246). The tendon installation went forward. On May 29, the tendons were connected to a foundation on the seabed and to the buoyancy modules. Nine of the sixteen tendons sank before they could be secured to the drilling platform. The remaining seven tendons were taken back to shore. An inspection report stated that the clamp bolts had failed, causing the tendons to detach from the buoyancy modules and sink. The Underwriters paid Chevron about $500 million for the loss.

The Underwriters then sued American Global Maritime, asserting negligence and negligent misrepresentation claims, among others. (Docket Entry No. 32 at 16–18). The Underwriters alleged that American Global Maritime was negligent in failing to appoint competent "personnel" and in failing "to identify and correct the glaring and obvious design errors that led to the collapse of the tendons." (*Id.* at 11). These "errors and omissions," alleged the Underwriters, "fell far short of the required standard of care and constitute negligence." (*Id.* at 16). The negligent misrepresentation allegation was based on American Global Maritime's breach of its "legal duty to review documents and procedures and ensure that they were correct before approving them." (*Id.* at 17). The Underwriters alleged that American Global Maritime made material misrepresentations by approving the tendon design and installation and by failing to "inform [the] Underwriters of the increasing nature and degree of risk as the installation project ran far outside its projected timelines." (*Id.*). The Underwriters sought actual damages for "the loss of the tendons, including but not limited to, costs to retrieve and store standing tendons and to replace and reinstall all of the lost tendons and [buoyancy modules]." (*Id.* at 16, 21). The Underwriters

described the "nature and type of [their] harm" as the "catastrophic failure of [] the construction installation project." (*Id.* at 17).

American Global Maritime moved to dismiss for failure to state a plausible claim, arguing that the antisubrogation rule barred the Underwriters' claims. (Docket Entries No. 29–30). The court granted the motion in part and denied it in part, finding that American Global Maritime was an "Other Assured" under the Offshore Construction Risk Policy; the Underwriters had waived subrogated claims against "Other Assureds"; and the Underwriters asserted direct, not subrogated, tort claims against American Global Maritime. (Docket Entry No. 63 at 18–21).

The court's July 2017 Memorandum and Opinion explained that:

[a] Louisiana court might reject the Underwriters' direct tort claims against American Global Maritime as impermissible artful pleading, or find that, in this case, public policy strongly militated against concluding that American Global Maritime owed the Underwriters a tort duty. Or a Louisiana court could find that this unusual set of facts justified an extension of the antisubrogation rule to bar any claim that, while not pleaded as a subrogated claim with the insurer standing in the shoes of its insured, would nonetheless have the functional effect of reimbursing an insurer for payments it made under the policy. But American Global Maritime has provided neither authority nor argument to support these approaches. . . . American Global Maritime is free to provide authority and argument in support of its positions at summary judgment.

(*Id.* at 21).

American Global Maritime predictably moved for summary judgment. It argued that the antisubrogation rule barred the Underwriters' claims; the Louisiana confusion doctrine extinguished claims; and it did not owe the Underwriters a tort duty under Louisiana law. (Document Entry No. 98 at 9–10). The Underwriters responded that American Global Maritime is not an "Other Assured" under the Offshore Construction Risk Policy; the antisubrogation rule does not bar direct tort claims; the Offshore Construction Risk Policy insured for property damage, not liability, and so the confusion doctrine did not apply; the insurance and indemnity clauses in

the Service Contract disclaimed coverage under the Offshore Construction Risk Policy; and American Global Maritime breached duties under theories of negligent misrepresentation and negligent-professional undertaking. (Docket Entry No. 106 at 10–12).

This court granted summary judgment for some of the claims against American Global Maritime, but denied it as to the claims sounding in negligence. (Docket Entry No. 111 at 36–41). The court had previously determined that "the anti-subrogation rule bars only subrogated actions," not direct tort claims, and found that "the record and arguments provide[d] no basis" for changing that decision. (*Id.* at 41). But the court noted that Louisiana's confusion doctrine could extinguish the negligence claims if the Underwriters had a duty to indemnify American Global Maritime for the losses sought through those negligence claims. (*Id.* at 43–44). Noting that the Offshore Construction Risk Policy permitted American Global Maritime to alter coverage through contract, and the Service Contract required American Global Maritime to indemnify Chevron and obtain commercial general liability insurance, the court declined to rule on the confusion doctrine until the parties addressed these aspects of the negligence claims. (*Id.* at 46–55). The court denied the summary judgment motion, without prejudice, allowing American Global Maritime to try again. This motion followed.

American Global Maritime again argues that the Louisiana confusion doctrine extinguishes the Underwriters' negligence claims and that the antisubrogation rule bars them. (Docket Entry No. 124 at 12–25). The Underwriters respond that neither the confusion doctrine nor the antisubrogation rule applies because of American Global Maritime's contractual arrangement with Chevron and because the negligence claims are direct claims. (Docket Entry No. 134 at 6–8). The parties' arguments are examined in detail below.

## II.    The Legal Standard on Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'"  *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case.  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).  "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response."  *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Duffie*

*v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

## III.  Analysis

The first step is to look to the Policies, the Service Contract, and the parties' contentions about what they mean. The second step is to analyze whether the confusion doctrine applies. The third step is to consider antisubrogation and whether the Underwriters' negligence claims, which are pleaded as direct causes of action, are prohibited under the rule that an insurer cannot sue its insured for a covered risk.

### A.  The Policies and Service Contract

Like many insurance disputes involving a number of named and other insureds and layers of insurance, piecing the insurance policies and related contracts together is a difficult puzzle with a lot of money turning on how it fits together. The puzzle pieces include who must pay for the damage and losses to the Bigfoot Project; in what order they must pay; and whether the Underwriters may recover against American Global Maritime for negligently causing the damage

and losses. Some points, so basic that they deserve repeating, are set out below; the parties know them well, but the court finds the reminders helpful.

- the Offshore Construction Risk Policy insured Chevron and American Global Maritime against "all risks of" damage to the Bigfoot Project;

- the Service Contract laid out American Global Maritime's duties, obligations, and requirements as Chevron's marine warranty surveyor for the Project;

- the Commercial General Liability Policy insured American Global Maritime for property damage or bodily injury that American Global Maritime became "legally obligated to pay," but not for liability "arising out of the rendering of or failing to render any professional services"; and

- the Professional Liability Policy insured American Global Maritime against liability for its services "as an architect, engineer, land surveyor, landscape architect, construction manager, interior designer, land planner, space planner, expert witness, or technical consultant."

(Docket Entry No. 124-2 at 14; Docket Entry No. 124-1 at 13, 52; Docket Entry No. 98-2; Docket Entry No. 98-1 at 56, 61).

Louisiana contract-interpretation principles apply. *See* 43 U.S.C. § 1333(a)(2)(A); (Docket Entry No. 111 at 13; Docket Entry No. 63 at 3–4). "An insurance policy is a contract between the parties and should be construed employing the general rules of interpretation of contracts." *Myers v. Welch*, 233 So. 3d 49, 55 (La. App. 1st Cir. 2017). Under Louisiana law, as in many states, all contracts, including insurance policies, are "interpreted in a common-sense fashion." *Clovelly Oil Co., LLC v. Midstates Petro. Co., LLC*, 112 So. 3d 187, 192 (La. 2013) (quoting *Prejean v. Guillory*, 38 So. 3d 274, 279 (La. 2010)). "Word and phrases . . . [must] be construed using their

generally prevailing meaning, unless the words have acquired a technical meaning." *Myers*, 233 So. 3d at 55. A contract may not "be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Id.* If the language is "clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written." *Id.*; *see* LA. CIV. CODE ANN. art. 2046. Each provision is to be read "in light of the other provisions" to consture "the contract as a whole." *Clovelly Oil*, 112 So. 3d at 192 (citing LA. CIV. CODE ANN. art. 2050).

The Offshore Construction Risk Policy, the Commercial General Liability Policy, and the Service Contract reflect the Bigfoot Project's scale and expense. The Project involved an estimated $2 billion, with commensurate risks of loss. (Docket Entry No. 98-1 at 24–25, 93, 102). Chevron paid the Underwriters $30,176,582 in premiums to insure against many of those risks. (*Id.* at 38). The Underwriters split Chevron's premium payment and spread the risks among themselves, so that no insurer had the full burden. The Underwriters agreed that their insurance would be "primary" and that they would "receive no contribution from[] any other insurance" for damage or loss to the Bigfoot Project. (*Id.* at 69).

The Underwriters' insuring obligations were expansive. The Offshore Construction Risk Policy had a $2 billion limit for "any one occurrence" and insured against "all risks of" physical loss or damage to "works executed anywhere in the world in the performance of all contracts relating to the Project." (*Id.* at 24–25, 61, 56). This "all risk" insurance covered "fortuitous losses," including property damage caused by negligence. *See U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 461–62 (5th Cir. 1982); *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 431 (5th Cir. 1980). But the Offshore Construction Risk Policy did not cover legal

liabilities arising from the Bigfoot Project work. The Policy instead expressly crossed out "liabilities" coverage. (Docket Entry No. 98-1 at 56).

The Offshore Construction Risk Policy extended coverage to "Other Assureds"—any person that "entered into written contract(s) [with Chevron] in connection with the Project"—and the Underwriters waived their subrogation rights against both Chevron and the Other Assureds. (*Id.* at 56–57). Although the Underwriters maintain that American Global Maritime is not an "Other Assured" under this definition, (Docket Entry No. 134 at 29), American Global Maritime's written Service Contract with Chevron makes clear that American Global Maritime is an "Other Assured." (*See* Docket Entry No. 111 at 41; Docket Entry No. 63 at 15); *cf. Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 518–19 & n.9 (5th Cir. 2019). A coverage waiver or indemnification obligation would change the extent of American Global Maritime's coverage, but not its Other Assured status. The Underwriters point out that only Chevron could exercise "[t]he rights of any Assured," but this does not change American Global Maritime's status under the Offshore Construction Risk Policy. (Docket Entry No. 98-1 at 57).

As an Other Assured, American Global Maritime was covered for damage or loss to any "property destined to become a part of the completed [P]roject, or used up or consumed in the completion of the [P]roject." (Docket Entry No. 98-1 at 61). The Offshore Construction Risk Policy allowed Other Assureds to alter this coverage, with restrictions:

> The interest of the Other Assured(s) shall be covered throughout the entire Policy Period for their direct participation in the venture, unless specific contract(s) contain provisions to the contrary. The rights of any Assured under this insurance shall only be exercised through the Principal Assureds. Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms, conditions and exclusions in the Policy.

(*Id.* at 57). The Underwriters contend that this and related provisions show that American Global Maritime "contractually waived any coverage under the [Offshore Construction Risk Policy] by agreeing to indemnify and insure Chevron and make Chevron's insurance non-contributory." (Docket Entry No. 134 at 11).

In its Service Contract with Chevron, American Global Maritime agreed to "[i]ssue Certificates of Approval to proceed for individual tendon installations," which would certify that each tendon "meets marine and insurance requirements and is ready to commence the offshore installation activities." (Docket Entry No. 98-2 at 71–72). American Global Maritime agreed to indemnify Chevron for up to $5,000,000 of damages or losses from the Service Contract. (*Id.* at 28). The Service Contract required American Global Maritime to obtain:

> Commercial General Liability (Bodily Injury and Property Damage) Insurance, including the following supplemental coverages: Contractual Liability to cover the liabilities assumed in this Contract; Products and Completed Operations; Explosion, Collapse and Underground Hazards; and Sudden and Accidental Pollution. The policy territory coverage must include all areas where the Services are to be performed. The policy limits must not be less than US$2,000,000 combined single limit per occurrence.

(*Id.* at 33). This Commercial General Liability Insurance was to name Chevron and its affiliates as additional insureds, be "primary with respect to all insureds, including additional insureds," and state that "no other insurance carried by [Chevron] will be considered as contributory for any loss." (*Id.* at 34). The Commercial General Liability Insurance limits did not affect American Global Maritime's "liability and indemnity obligations in th[e Service] Contract." (*Id.* at 33).

The Commercial General Liability Policy that American Global Maritime obtained covered bodily injury or property damage that it became "legally obligated to pay" because of an "OCCURRENCE," but excluded injuries or damages from "PROFESSIONAL SERVICES." (Docket Entry No. 124-1 at 13, 52 (emphasis in original)). As the Service Contract required, the Commercial

General Liability Policy made Chevron an Additional Insured and stated that "this policy will be primary and NON-CONTRIBUTORY if [American Global Maritime] and the Additional Insured have agreed [so]." (*Id.* at 31 (emphasis in original)). The Commercial General Liability Policy defined "NON-CONTRIBUTORY" to mean "that other available insurance will apply as excess and will not contribute as primary to the insurance provided by this policy." (*Id.* at 35 (emphasis in original)).

The Offshore Construction Risk Policy, the Service Contract, and the Commercial General Liability Policy all contained primary and noncontributory clauses. The Underwriters argue that these clauses in the Service Contract and in the Commercial General Liability Policy waived or abrogated American Global Maritime's coverage under the Offshore Construction Risk Policy. While the terms "primary" and "contribution" have different meanings, both concern the relationships and rights of insurers covering the same risks for the same insured.

An insurer that issues a "primary" policy has to "pay out its entire limit first, followed by payments under policies that were intended to be excess." *Certain Underwriters v. Ill. Nat'l Ins. Co.*, 99 F. Supp. 3d 400, 404 (S.D.N.Y. 2015). "An insurer providing excess coverage is generally only liable for the amount above what might be collected from primary insurance." *N. Am. Capacity Ins. Co. v. Colony Specialty Ins. Co.*, 273 F. Supp. 3d 711, 715 (S.D. Tex. 2017); *see Penton v. Hotho*, 601 So. 2d 762, 767 (La. App. 1st Cir. 1992) ("[T]he primary insurance . . . must be exhausted before the excess policy is required to contribute anything."). The term "primary" relates to the order of payment among insurers covering the same risk.

In contrast, "the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." 15 COUCH ON INSURANCE § 217:4 n.25 (3d ed. 2019); *see Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d

429, 435 (5th Cir. 2003). The insurer that paid a loss or defended an action may "seek payment from the other insurers of their fair share of the loss." 15 COUCH ON INSURANCE § 217:4. "[C]ontribution affects only the relationship of the [insurers] among themselves, and has no direct effect on the rights of a given insured," because "the insurers' contractual obligation to the policyholder is to cover the full extent of the policyholder's liability up to the policy limit." *Id.* § 217:4 & n.28.

If a policy is primary *and* noncontributory, the insurer "is responsible for indemnifying an insured up to the applicable policy limit before any other insurer covering the same liability is obligated to indemnify, and the latter insurers are not obligated to share in the primary and non-contributory insurer's costs." *U.S. Liab. Ins. Co. v. First Mercury Ins. Co.*, No. C. 15-2293, 2015 WL 4911820, at *1 n.1 (N.D. Cal. Aug. 17, 2015); *see First Mercury Ins. Co. v. Great Divide Ins. Co.*, 241 F. Supp. 3d 1028, 1037 n.3 (N.D. Cal. 2017) ("A non-contributing or non-contributory policy does not seek contributions from other policies covering the same risk."); *RSC Equip. Rental, Inc. v. Cincinnati Ins. Co.*, 54 F. Supp. 3d 480, 488 (W.D. Va. 2014) ("[T]he primary and noncontributory language suggests that . . . the insurance . . . must pay before other applicable policies . . . and without seeking contribution from other policies that also claim to be primary." (internal quotation marks omitted)).

Because this case does not involve loss allocation among insurers, the court need not dive into what happens when an insured has multiple primary-and-noncontributory policies, but the insurers generally share the loss. *See Emp'rs Cas. Co. v. Emp'rs Commercial Union Ins. Co.*, 632 F.2d 1215, 1218 (5th Cir. 1980) ("In a case where two or more insurance carriers have primary coverage, they share the liability either equally or in proportion to the limits of each policy as compared to the combined limits of all policies."); 15 COUCH ON INSURANCE § 219:23 ("Where

several policies of marine insurance are issued upon the same property and risk, and contain no clause as to apportionment of the liability of the insurers, the insured may recover a proportionate part of the loss from each of the insurers.").

What is important is that under the primary and noncontributory clauses in the Offshore Construction Risk Policy, the Service Contract, and the Commercial General Liability Policy, the Offshore Construction Risk Policy and Commercial General Liability Policy insurers must pay first and the insurers cannot seek payment from other insurers for the same risks. Even assuming that the Service Contract and the Commercial General Liability Policy turned the Offshore Construction Risk Policy into excess coverage, which is far from clear,[2] American Global Maritime would still be entitled to Offshore Construction Risk Policy coverage after the Commercial General Liability Policy limit was reached. *See Certain Underwriters*, 99 F. Supp. 3d at 404 ("[A] policy that identifies itself as primary must pay out its entire limit first, followed by policies that were intended to be excess.").

The noncontribution clauses have "no direct effect on the rights of" American Global Maritime. 15 COUCH ON INSURANCE § 217:4 ("The principle of contribution affects only the relationship of the co-obligors among themselves, and has no direct effect on the rights of a given insured."). The Underwriters' obligation is to provide coverage "up to the policy limit." *Id.* § 217:4 n.28. The Underwriters' argument that the primary and noncontributory clauses waived

---

[2] The Offshore Construction Risk Policy permitted American Global Maritime to alter coverage by contract, and the Commercial General Liability Policy stated that "other available insurance will apply as excess and will not contribute as primary." (Docket Entry No. 124-1 at 31, 35). But neither the Service Contract nor the Commercial General Liability Policy contains a clause stating that the Offshore Construction Risk Policy would be considered excess.

or abrogated American Global Maritime's Offshore Construction Risk Policy coverage is unpersuasive.[3]

The Underwriters' indemnification argument has a similar problem. The Underwriters argue that the "Fifth Circuit has held . . . that [an] indemnity agreement *controls* over the terms of the policies purchased to support the indemnity obligations when determining which policies apply," citing *American Indemnity Lloyds v. Travelers Property and Casualty Insurance Company*, 335 F.3d 429 (5th Cir. 2003). (Docket Entry No. 134 at 7). In *American Indemnity*, the Fifth Circuit identified the Texas rule as requiring that indemnity agreements have "controlling effect" over "'other insurance' or similar clauses" allocating losses among insureds. 335 F.3d at 436. Assuming that the Louisiana courts would recognize this rule, the Service Contract "capped" American Global Maritime's liability at $5,000,000. (Docket Entry No. 98-2 at 28). Once that cap was reached and the Commercial General Liability Policy limits were exhausted, American Global Maritime would be entitled to coverage under the Offshore Construction Risk Policy. The indemnification clause did not shift the "entire loss" to American Global Maritime, as the Underwriters argue. *Am. Indem.*, 335 F.3d at 436 (quoting 15 COUCH ON INSURANCE § 219:1 (3d ed. 1999)).

Neither the primary-and-noncontributory nor the indemnification clauses eliminated American Global Maritime's Offshore Construction Risk Policy coverage. At most, those clauses required American Global Maritime to pay $5,000,000—about one percent of what the

---

[3] The parties argue about whether American Global Maritime's work fell under the Commercial General Liability Policy's professional-services exclusion, but the court need not resolve that issue. Even if the Commercial General Liability Policy covered the losses from American Global Maritime's allegedly negligent work on the Bigfoot Project, American Global Maritime would still be entitled to Offshore Construction Risk Policy coverage after the Commercial General Liability Policy's $2,000,000 limit was reached. *See* 15 COUCH ON INSURANCE § 217:16 ("An insurer seeking indemnification in accordance with a provision in a contract between its insured and another party has no greater rights than are provided for in the contract.").

Underwriters paid for the losses from the tendon detachment—before the Offshore Construction Risk Policy coverage kicked in.

## B.  The Confusion Doctrine

The fuller record, the parties' additional argument and authorities, and their briefs support finding that the confusion doctrine does not extinguish the Underwriters' negligence claims against American Global Maritime.  Under the confusion doctrine, "[w]hen the qualities of obligee and obligor are united in the same person, the obligation is extinguished by exhaustion."  LA. CIV. CODE ANN. art. 1903.  "[W]hen a person is placed in the position of owing money to herself, the obligation is extinguished by confusion."  *Goers v. Mayfield*, 195 So. 3d 1, 2 (La. App. 2d Cir. 2016); *see Langley v. Police Jury of Calcasieu Par.*, 201 So. 2d 300, 304–05 (La. App. 3d Cir. 1967) (en banc); *see, e.g.*, *Matter of Dibert, Bancroft & Ross Co., Ltd.*, 117 F.3d 160, 170–71 (5th Cir. 1997) (the confusion doctrine applies, for example, when a "promissory note that is secured by [a] mortgage is acquired by its maker" or "an encumbered building is acquired by the mortgagee" (emphasis omitted)).  The confusion doctrine requires that the same person "acquire the full and perfect ownership of both sides of the obligation."  *Langley*, 201 So. 2d at 305 (quotation omitted).  The doctrine may apply to extinguish a contract or tort cause of action. *McAuslin v. Grinnell Corp.*, Civ. A. No. 97-775, 2000 WL 1191073, at *3 (E.D. La. Aug. 22, 2000).

The Underwriters argue that the Offshore Construction Risk Policy covered damage to the Bigfoot Project from all risks, including negligence, but the Policy did not cover liability for causing that damage through negligence.  (Docket Entry No. 134 at 11–13).  The court agrees. The Offshore Construction Risk Policy covered "physical damage . . . incurred by the Assureds," but it did not provide "liabilities" coverage.  (Docket Entry No. 98-1 at 56).  The Offshore

Construction Risk Policy "provides property insurance for" the Bigfoot Project and "reimburses [Chevron], or any party with an insurable interest . . . for the accidental loss, damage, or destruction of the property, regardless of fault." *Data Specialties, Inc. v. Transcon. Ins. Co.*, 125 F.3d 909, 914 (5th Cir. 1997). It did not cover Chevron's or an Other Assured's liability. (*See* Docket Entry No. 98-1 at 61 ("[T]his policy insures against all risks of physical loss of and/or physical damage to the property covered.")). The Underwriters are not obligated to cover American Global Maritime for the losses or damages it was obligated to pay from its work on the Bigfoot Project.

The Underwriters assert negligence against American Global Maritime to recover the payments they made to Chevron under the Offshore Construction Risk Policy. While this claim runs against the rule that "[g]enerally, insureds may not be made liable to their insurers for covered losses," it does not implicate the confusion doctrine. *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 593 (8th Cir. 2002). Because the Underwriters have no duty to pay for American Global Maritime's negligence, they are not on both sides of the obligation, and confusion does not extinguish their negligence claim. *See Langley*, 201 So. 2d at 305. Whether the Underwriters are otherwise precluded from seeking to recover from an "Other Assured" for a covered risk, after waiving subrogation rights, is a separate issue.

## C. Subrogation

Insurance policies often give the insurer subrogation rights allowing that insurer to assert the insured's legal rights against a third party. *See AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.*, 920 F. Supp. 1318, 1326 (S.D. Tex. 1996) (collecting cases). A subrogated claim is one asserted by the insurer, standing in the insured's shoes, to recover against a third party that caused the loss paid by the insurer. *See id.*; *White v. Allstate Ins. Co.*, No. 95-55824, 1996 WL 601476, at *7 (9th Cir. Oct. 18, 1996) (per curiam) ("Subrogation is an equitable doctrine

which entitles the insurer to 'stand in the shoes' of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse."); 16 COUCH ON INSURANCE § 222:5 ("[O]n paying a loss, an insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, such that the insurer is entitled to bring an action against this third party whose negligent or other tortious or wrongful conduct caused the loss.").

It is "fundamental" that "an insurer may not sue its own insured to recover under the insurance policy." *Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1177 (5th Cir. 1992) (collecting cases). An insurer, even by subrogation, cannot "recover against its insured or an additional assured any part of its payment for a risk covered by the policy."[4] *Peavey*, 971 F.2d at 1177; *Chenevert v. Travelers Indem. Co.*, 746 F.3d 581, 587 (5th Cir. 2014) ("[T]he prohibition of insurers' subrogation against their own insured applies to claims arising from the very risk for which the insured was covered by that insurer." (quotation omitted)); *Dow Chem. Co. v. M/V Roberta Tabor*, 815 F.2d 1037, 1043 (5th Cir. 1987) ("[A]n insurer cannot by way of subrogation recover against its insured or an additional assured any part of its payment for a risk covered by the policy."); *Shelter Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 993 So. 2d 236, 240 (La. App. 1st Cir. 2008) ("It is well settled that an insurer cannot be subrogated against its own insured"); *Stafford Metal Works, Inc. v. Cook Paint & Varnish Co.*, 418 F. Supp. 56, 58 (N.D. Tex. 1976) ("[A]n insurer cannot subrogate itself against its own insured where the injury was caused by the negligence of the insured himself.").

---

[4] Some cases suggest that an insurer may assert a subrogated claim against an insured or additional assured if there is "express policy language" allowing it. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Williams*, 676 F. Supp. 123, 126 (E.D. La. 1987). A leading treatise has observed: "[w]hile there is some indication that a sufficiently clear agreement between insurer and insured . . . might be effective to allow subrogation against the insured, examination of such statements usually reveals that it is reimbursement from the insured, not subrogation against a third party, that really is at issue." 16 COUCH ON INSURANCE § 224:1.

The prohibition on subrogation against an insured has roots in logic, equity, and public policy. *See Stafford Metal Works*, 418 F. Supp. at 58; *cf. Nat'l Union Fire Ins. Co. of Pittsburgh v. Hartford Ins. Co. of Midwest*, 248 A.D.2d 78, 85 (N.Y. App. Div. 1998). One justification is that an insurer "cannot be subrogated against an insured because an insurer who seeks subrogation stands in the shoes of the insured," and an insured cannot sue itself. *Aldous v. Darwin Nat'l Assurance Co.*, 851 F.3d 473, 488 (5th Cir. 2017) (quotation omitted). Another is that subrogation against an insured "would permit an insurer, in effect, to pass the incidence of the loss, either partially totally, from itself to its own insured, and thus avoid the coverage which its insured purchased." *AGIP Petroleum*, 920 F. Supp. at 1326 (quoting *Taylor v. Bunge Corp.*, 845 F.2d 1323, 1329 (5th Cir. 1988)). Allowing an insurer to assert subrogated claims against its insured threatens the relationship between them; gives the insurer an incentive "to secure information . . . under guise of policy provisions . . . for later use in a subrogated action against the insured"; and creates an appearance of "judicial sanction to breach the policy of insurance." *Stafford Metal Works*, 418 F. Supp. at 58–59; *White*, 1996 WL 601476, at *7 ("Public policy requires this . . . rule both to prevent the insurer from passing the incidence of loss to its insured and to guard against the potential conflict of interest that may affect the insurer's incentive to provide a vigorous defense for its insured.").

Even if subrogated claims are barred, "there may be causes of action by an insurer outside the policy." *Peavey*, 971 F.2d at 1177. Two cases, *United States v. Parish of St. Bernard*, 56 F.2d 1116 (5th Cir. 1985), and *Peavey Co. v. M/V ANPA*, 971 F.2d 1168, are instructive.

In *St. Bernard*, the United States sued Louisiana parishes "to recover for any property the parishes owned and insured under the [National Flood Insurance Program]," because the parishes allegedly violated contract and regulatory obligations. 756 F.2d at 1119. While "it is a

fundamental principle of insurance law that an insurer may not sue its own insured on the insurance policy," the court stated, "there may be causes of action by an insurer outside the policy, i.e. fraud." *Id.* at 1127. The court declined to foreclose the claims "prior to any real discovery having occurred," cautioning that "none of the claims that may be articulated in subrogation actions against the parishes are available to the United States as an insurer." *Id.* at 1128. The court also warned that "any action by the United States against the parishes for the value of the property which the parishes insured under the [policies] must not be in violation of the fundamental principle of insurance law that an insurer cannot sue its insured." *Id.*

In *Peavey Co. v. M/V ANPA*, a ship crashed into a wharf on the Mississippi River, and the ship owner blamed the company that had designed the ship's fumigation system. 971 F.2d at 1170–71. The fumigation company failed to notify its insurer of the potential claim until after the ship's cargo had been emptied, the surveys completed, and the ship had sailed away. *Id.* The shipowners sued, and the insurer paid to defend and settle the case. *Id.* The insurer then sued the fumigation company to recover the $675,000 paid in defense and settlement costs, contending that the untimely notice had caused prejudice. *Id.* at 1171. Citing *St. Bernard*, the panel noted that "there may be causes of action by an insurer outside the policy." *Id.* at 1177. Because the insurer "did not volunteer itself to pay the settlement fees" and "reserved its rights to dispute the coverage matter," the action was "not one of subrogation but one of reimbursement." *Id.* The court held that the suit was "not against public policy." *Id.*

*St. Bernard* and *Peavey* carved narrow paths for insurers. *St. Bernard* recognized that an insurer may, in "extremely limited" circumstances, sue its insured "outside the policy" to recover for losses. 756 F.2d at 1127–28. The *St. Bernard* court noted that "actions for fraud have traditionally been recognized at common law as a means of recovery from insureds by their

insurers," without suggesting what other claims might be permissible.  *Id.* at 1128.  *Peavey* has been described as allowing an insurer to "bring a reimbursement action against its insured for recovered property or an insurer[']s overpayment for losses, even where a subrogation action is forbidden."  *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 656 (5th Cir. 2004) (citing 16 COUCH ON INSURANCE § 226:4 (3d ed. 2000)); *see also Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 987 (5th Cir. 1993) (citing *Peavey*, 971 F.2d at 1176–78)).  Reimbursement is "the contractual right of an insurer to a refund directly from the insured when the insured also receives payment for those same expenses from another source."  16 COUCH ON INSURANCE § 226:4.

The related antisubrogation rule means that "once an insurance underwriter waives subrogation as to a named insured, the underwriter cannot recover from that insured any portion of the proceeds paid to settle a loss covered by the policy."  *Hvide Marine Int'l, Inc. v. Emp'rs Ins. of Wausau*, No. 88 CIV 1523, 1989 WL 140280, at *5 (S.D.N.Y. Nov. 16, 1989) (citing *Marathon Oil Co. v. Mid-Continent Underwriters*, 786 F.2d 1301, 1304 (5th Cir. 1986); *Wiley v. Offshore Painting Contractors, Inc.*, 711 F.2d 602 (5th Cir. 1983)).  "[T]he rule applies even when [an] additional assured is not covered under the policy for the specific risk at issue."  *FloaTEC*, 921 F.3d at 521; *see Lanasse v. Travelers Ins. Co.*, 450 F.2d 580, 585 (5th Cir. 1971).

In the seminal case, *Marathon Oil Co. v. Mid-Continent Underwriters*, the Fifth Circuit held:

> when underwriters issue a policy covering an additional assured and waiving "all subrogation" rights against it, they cannot recoup from the additional assured any portion of the sums they have paid to settle a risk covered by the policy, even on the theory that the recoupment is based on the additional assured's exposure for risks not covered by the policy.

786 F.2d at 1302; *see FloaTEC*, 921 F.3d at 521.

Marathon Oil Co. had chartered a ship from a ship-rental company. The ship-rental company purchased insurance from underwriters covering Marathon as an additional assured, but "only for claims arising out of the operation of the vessel," and waiving the underwriters' "rights of subrogation" against Marathon. *Id.* at 1303 (quotation omitted). A seaman working aboard the ship was injured "through the negligence, at least in part," of a crane operator on an oil platform. *Id.* The seaman filed two lawsuits, one that included the underwriters and another against only Marathon. *Id.* The underwriters settled with the seaman for $60,000, on the condition that he pay them "the first $30,000 he recovered from Marathon." *Id.* While the underwriters insured Marathon for liability arising from operating the rented ship, not the oil platform, the court held that the underwriters could not recover from Marathon because "the provision of insurance necessarily implies that the insurer will not seek to recoup amounts paid by it to satisfy insured claims," and because they "had waived 'all subrogation'" rights and could not have sued "to recover from Marathon any part of the $60,000" paid to the seaman. *Id.* at 1303–04.

In *Marathon Oil*, although the insurance did not cover "liability arising" from oil-platform operations, it was enough that the insurance covered "the *type of risk* that occurred." *Roberta Tabor*, 815 F.2d at 1045 (emphasis in original). In one of the appeals from this case, the Fifth Circuit described *Marathon Oil*'s "forbidden scenario" as one in which: (1) the insurers would recoup from an additional assured the sums paid to settle a risk covered by the policy; (2) the policy waived subrogation against the additional assured; and (3) the insurers seek to recoup based on risks either covered or not covered by the policy. *FloaTEC*, 921 F.3d at 522.

The Underwriters allege that American Global Maritime, the Bigfoot Project's marine warranty surveyor, breached the standard of care owed to them, causing them to pay Chevron under the Offshore Construction Risk Policy. These claims are direct; they are not subrogated.

The Underwriters do not dispute that the Offshore Construction Risk Policy covered damage to the Bigfoot Project arising from negligence, including negligence in providing the sort of services that American Global Maritime performed. American Global Maritime is an "Other Assured" under the Offshore Construction Risk Policy. The Underwriters waived subrogation rights against American Global Maritime. The Underwriters paid Chevron for the damages and losses from the tendon detachment, then sued American Global Maritime for the same damages and losses. The question is whether the "fundamental principle" that "an insurer may not sue its own insured" forecloses this claim. *Peavey*, 971 F.2d at 1177.

The Underwriters assert that their claim is to recover for American Global Maritime's alleged negligence, not to recover the insurance benefits paid for the damages and losses to the Bigfoot Project as a result of that negligence. (Docket Entry No. 134 at 26–29; Docket Entry No. 142 at 3). The Third Amended Complaint alleges that American Global Maritime was negligent "in certifying unsafe designs and operations that precluded Underwriters from preventing the loss or withdrawing coverage." (Docket Entry No. 134 at 15). To prevail on their negligence claim, the Underwriters must plead and prove the damages caused by American Global Maritime's breach of the duty it owed to the Underwriters. *See Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001) (a negligence claim requires "proof of actual damages"). The Third Amended Complaint alleges that American Global Maritime caused the Underwriters damage "by the loss of the tendons, including but not limited to, costs to retrieve and store standing tendons and to replace and reinstall all of the lost tendons and [buoyancy modules]." (Docket Entry No. 32 at 16–17). The Underwriters' only alleged damages are the money they paid Chevron under the Offshore Construction Risk Policy for the losses and damages from the tendon detachment. While the

Underwriters clothe these damages in negligence dress, they are the damages the Underwriters paid Chevron under the Offshore Construction Risk Policy.

The Underwriters are suing American Global Maritime for "the sums they have paid to settle a risk covered by the [Offshore Construction Risk Policy]"—the damages or losses American Global Maritime's alleged negligence caused to the Bigfoot Project. *Marathon Oil*, 786 F.2d at 1302. The Underwriters' claim is not for reimbursement. *See* 16 Couch on Insurance § 226:3 (recovery on a reimbursement theory is "contingent upon an actual recovery by the insured from some third party"). The Underwriters have pointed to no case permitting an insurer to sue an additional assured for negligently causing property damage, when the insurance policy covered the property damage from that negligence. The Fifth Circuit has noted that the common law permits insurers to assert fraud claims against insureds, but there are no allegations of fraud or other willful misconduct against American Global Maritime, and other claims available outside the insurance policy are "extremely limited." *St. Bernard*, 756 F.2d at 1128.

The Underwriters state that the Offshore Construction Risk Policy did not cover American Global Maritime's professional liability. That statement is true, but it misses the point. The Offshore Construction Risk Policy insured Chevron and American Global Maritime against "all risks of" damages or losses to the Bigfoot Project, including those caused by negligence. (Docket Entry No. 98-1 at 61). The Underwriters are suing American Global Maritime for damages from its negligence, a covered risk. Because the Underwriters sue American Global Maritime, an "Other Assured," to recover for covered damages to the Bigfoot Project, their lawsuit runs afoul of the principle that an insurer may not sue an insured to recover money paid for the risk that the insurer promised to insure. *Peavey*, 971 F.2d at 1177; *Roberta Tabor*, 815 F.2d at 1044–45; *Marathon Oil*, 786 F.2d at 1302. The negligence claims may not proceed. The Underwriters were paid about

$30 million for assuming the risks specified in the Offshore Construction Risk Policy. In May 2015, one of those risks became reality when the tendons sank to the seafloor, and, negligence or not, the Underwriters had to pay.

The Underwriters request additional discovery, stating that "[t]he lack of discovery presents evidentiary impediments to Underwriters' burden of proof." (Docket Entry No. 134 at 29–30). The Underwriters state that "no substantive discovery has taken place." (*Id.* at 29). To obtain additional discovery, Underwriters may not "simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir 2010)). They "must 'set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.'" *Id.* (quoting *Raby*, 600 F.3d at 561).

The Underwriters' response to the second motion for summary judgment identifies no specific facts likely to emerge from discovery that are likely to change the outcome. (*See* Docket Entry No. 134 at 29–30). The Underwriters cite their response to the first motion for summary judgment, which sought additional discovery on the relationship between the Underwriters and American Global Maritime. (*See* Docket Entry No. 104 at 8–9). The court considered and denied that discovery request. (Docket Entry No. 111 at 32–34, 54). The Underwriters have not articulated how additional discovery would likely reveal otherwise unknown facts that bear on the issues in this case. There has already been extensive record development and motions practice, and the undisputed facts show that the Underwriters' only remaining claim is foreclosed as a matter of law. The Underwriters identify no basis to change this result. The discovery request is denied.

## IV.    Conclusion

American Global Maritime's motion for summary judgment is granted.  (Docket Entry

Nos. 123–24).  The Underwriters' request for discovery is denied.  (Docket Entry No. 134 at 29–

30).  Final judgment is separately entered.

SIGNED on July 9, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge